**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ELIZABETH CASTRO, MICHAEL A. FLOREZ, and LATONYA BROOKS,** | ) ) ) | |
| **Plaintiffs,** | ) ) | **No. 10 C 5869** |
| **v.** | ) ) | **Magistrate Judge Finnegan** |
| **DEVRY UNIVERSITY, INC.** | ) ) | |
| **Defendant.** | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Elizabeth Castro, Michael A. Florez, and LaTonya Brooks filed a two-count complaint charging their former employer, DeVry University, with (a) subjecting them to a hostile work environment through derogatory racial and ethnic statements by their supervisor, and (b) terminating their employment in retaliation for complaining about the supervisor's conduct, both in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). DeVry has now filed separate motions for summary judgment as to each Plaintiff. In their consolidated response, Plaintiffs concede that the hostile work environment claims should be dismissed but argue that the retaliatory discharge claims must be decided by a jury. For the reasons set forth below, the Court grants DeVry's motions for summary judgment as to all claims.

## OVERVIEW

In April 2007, Plaintiffs went to Human Resources ("HR") and jointly complained about their manager, Phil Giambone, the Dean of Admissions for DeVry's Chicago office.  Castro was an Assistant Dean, directly supervising Brooks and Florez who worked as "Advisors" in recruiting students.  During the meeting with HR, Plaintiffs said Giambone created a "hostile environment" because of his derogatory ethnic and racial comments and his "management by threats" style.  They gave examples of the derogatory comments that he frequently made.  As for the threats, Brooks described how she questioned Giambone at a meeting about the very old recruiting leads they were receiving and he later warned that she would not be around long if she was disloyal to him.  Plaintiffs also complained to HR that Giambone made Advisors feel guilty for taking a vacation or personal day.  They said his lack of management skills had led to extremely low morale and was the reason so many Advisors had left, predicting more would do so if his behavior continued.

A few months later, in July 2007, DeVry made a number of personnel changes. Giambone was moved out of the Chicago office and into the field, so his interactions with Plaintiffs ceased (in August 2008 he stopped working for DeVry entirely).  A handful of others were also moved, including Castro.  Though her salary did not change, Castro was stripped of her supervisory duties and transferred to another office where she worked as a Senior Advisor.  Florez and Brooks remained in the Chicago office but reported to new supervisors.  Each Plaintiff remained at DeVry for an extended period

after this but ultimately was terminated: Florez in February 2008, Brooks in July 2008, and Castro in November 2009.

In September 2010, Plaintiffs filed this joint lawsuit, alleging that each was fired in retaliation for complaining to HR about Giambone in April 2007. DeVry acknowledges that Plaintiffs engaged in "protected conduct" when they informed HR about Giambone's derogatory racial and ethnic comments. All parties agree that the key issue now is whether Plaintiffs can establish a causal nexus between that protected conduct and their eventual terminations under different supervisors several months later: 10 months later for Florez; 15 months later for Brooks; and 26 months later for Castro.

In opposing summary judgment, Plaintiffs argue that they have established that nexus using the direct method of proof and based on circumstantial evidence. To overcome the lack of temporal proximity between the protected conduct and the terminations, Plaintiffs focus heavily on Giambone's "retaliatory" conduct shortly after the meeting with HR even though he admittedly was gone three months later and played no role in their terminations. Plaintiffs also attempt (without success) to show that their new supervisors learned and cared that they told HR about Giambone's offensive statements and thus were motivated to retaliate and eventually terminate them.

Unfortunately for Plaintiffs, even when the factual disputes are resolved (and inferences drawn) in their favor, they are unable to muster sufficient evidence of a causal connection between the protected conduct and the terminations. Given all the circumstances here, including the change in supervisors, the long passage of time

between the protected conduct and the terminations, and the many intervening events that bear on what happened, no reasonable inference can be drawn that the terminations were in retaliation for the protected conduct.

## FACTUAL BACKGROUND[1]

### A.    The Parties

DeVry is a for-profit organization that grants higher education degrees in Illinois and elsewhere. *See* DeVry website, http://www.devry.edu (last visited Apr. 16, 2013). During the relevant time period, Christine Hierl served as Dean of Enrollment Management for the Chicago Metro area (hereinafter "Dean Hierl").  (Hierl Decl., Doc. 49-3 at ¶ 2).   Reporting to Dean Hierl were two Directors of Admissions ("DA"): Phil Giambone was responsible for the Chicago office, and Kathaleen Berry was responsible for the other two Chicagoland DeVry locations in Addison and Tinley Park.  (*Id.* at ¶ 3).

Plaintiffs Elizabeth Castro, Michael Florez, and LaTonya Brooks are former DeVry employees.  (Pl. Castro's 56.1 Resp. ("Castro Resp."), Doc. 70 at ¶ 1; Pl. Florez's 56.1 Resp. ("Florez Resp."), Doc. 71 at ¶ 1; Pl. Brooks's 56.1 Resp. ("Brooks Resp."), Doc. 72 at ¶ 1).  Castro and Florez both consider themselves to be of Mexican national origin.  (Castro Resp., Doc. 70 at ¶ 1; Florez Resp., Doc. 71 at ¶ 1).  Brooks considers

---

[1]      To minimize the number of lengthy record citations, the Opinion often cites only a single plaintiff's Rule 56.1 Response or Statement of Additional Facts for factual assertions common to all three plaintiffs.  This factual summary is necessarily one-sided, written largely from Plaintiffs' perspective, since all evidence must be viewed in the light most favorable to the nonmoving party. *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 702 (7th Cir. 2012).  Such favor "does not extend to drawing inferences that are supported by only speculation or conjecture." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (internal quotation marks and brackets omitted).  Nor does it extend to accepting the liberties that Plaintiffs sometimes take with the record when stringing together the "facts" in their pleadings.

her national origin to be African-American and her race to be Black/Non-Hispanic. (Brooks Resp., Doc. 72 at ¶ 1).

Castro began working for DeVry in 1997 as a secretary, and by January 2006 was an Assistant Director of Admissions ("ADA") in the Chicago office. (Castro Resp., Doc. 70 at ¶ 5; Pls' Add'l Facts, Doc. 69 at ¶¶ 1-2). Until July 2007, Castro supervised co-plaintiffs Florez and Brooks. (Florez Resp., Doc. 71 at ¶ 6; Brooks Resp., Doc. 72 at ¶ 5). Castro in turn reported to DA Giambone who reported to Dean Hierl. (Castro Resp., Doc. 70 at ¶¶ 5-6; Florez Resp., Doc. 71 at ¶ 6). Florez and Brooks both worked as Advisors. Giambone interviewed and hired Florez in October 2005; Florez was based out of his home at that time. Giambone twice promoted Florez — to Advisor I and then to Advisor II. (Florez Resp., Doc. 71 at ¶ 7). Brooks began working as an Advisor in the Chicago office in October 2006. (Brooks Resp., Doc. 72 at ¶ 5).

As Advisors, Florez and Brooks were responsible for "doing phone work, interviewing prospective students, performing follow-up with prospective students, and otherwise assisting prospective students with the enrollment process, all with the ultimate goal of securing students to commence school at DeVry." (Castro Resp., Doc. 70 at ¶ 8). Castro's responsibilities as an ADA consisted of recruiting students to enroll at DeVry, as well as hiring, training, overseeing, and coaching Advisors and ensuring budgets were met. (*Id.* at ¶¶ 7, 9). The primary performance measure for ADAs and Advisors "was the number of students secured to commence school at DeVry," or "starts," with Advisors evaluated on their own numbers and ADAs evaluated on both their own numbers and their team's overall numbers. (*Id.* at ¶ 9). Advisors were also

5

evaluated on the process they used to secure starts, such as the number of interviews conducted and applications received. (Brooks Resp., Doc. 72 at ¶ 8). DeVry sat new classes every two months in odd months. (Castro Resp., Doc. 70 at ¶ 10).

**B.     The 2006 Departmental Reorganization**

In the summer of 2006, DeVry reorganized the Enrollment Management Department to categorize ADAs and Advisors either as presenters, who visited high schools to generate leads, or as recruiters, who worked in DeVry offices to convert leads into student enrollments. (Castro Resp., Doc. 70 at ¶ 11). As a result of the reorganization, Castro was assigned to be one of two ADAs in the Chicago office where she continued to report to Giambone and had more interaction with him than she did previously. (Castro Dep., Doc. 49-9 at 49:14-50:9, 76:4-8). There, she served as ADA for a team of two Advisors, Florez and Brooks, who were newly designated as "recruiters" at the Chicago office. (Castro Resp., Doc. 70 at ¶ 11; Hierl Decl., Doc. 49-3 at ¶¶ 7-8). In this revised role, all Advisors were now expected to work from DeVry offices rather than from their homes, which meant that instead of going to the homes of prospective students as they previously did, the Advisors scheduled appointments with students and their parents in the DeVry offices. (Castro Decl., Doc. 74-1, Tab B at ¶ 3). As a result, "the number of 'no-shows' increased dramatically, thus making recruiting more difficult." (*Id.*)

**C.     Castro's Transfer Request**

In October 2006, several months after the reorganization, Castro complained to Giambone that she and her team members were receiving "really bad" leads. She

complained again in January 2007 after finding undistributed leads in a drawer. (Castro Resp., Doc. 70 at ¶ 13). During this same time period, Castro talked to Dean Hierl and DA Berry (Giambone's counterpart in the Tinley Park and Addison offices) about possibly transferring to Berry's region. (Castro Dep., Doc. 74-4 at 78:16-79:21). Castro testified that she asked Berry about transferring to her office, but Berry said Hierl would never approve it. Hierl said she needed Castro to help in Chicago because Castro was a great ADA. (*Id.* at 78:16-79:1).

On January 22, 2007, Castro contacted Deb Maher, DeVry's Director of Human Resources and Ethics Officer, to request a transfer to another department. (Castro Dep., Doc. 74-4 at 82:1-19). Maher emailed her the transfer request form, which Castro submitted a couple months later. (*Id.* at 83:5-14). However, Dean Hierl told Castro she would not allow a transfer until after the July class. (*Id.* at 156:12-19). In March 2007, Hierl told Castro that she believed Castro's production levels did not justify her compensation. Castro responded by complaining about the quality of the leads she was being given. (Castro Resp., Doc. 70 at ¶¶ 15-17).

## D. Giambone's Derogatory Racial and Ethnic Comments

When she began working more closely with Giambone after the reorganization, Castro found him to be "a micromanager who unnecessarily and constantly harangued all his subordinates to 'get on the phone.'" (Castro Resp., Doc. 70 at ¶ 12). Moreover, he made frequent racial and ethnic comments within the office. Plaintiffs and at least two other employees found the comments offensive. (Brooks Dep., Doc. 74-2 at 46:11-

47:24; Castro Dep., Doc. 74-4 at 98:14-24; Florez Dep., Doc. 74-3 at 167:7-169:10; Leal Dep., Doc. 74-8 at 26:1-27:14; Lucio Dep., Doc. 74-12 at 41:5-42:8).

For example, Giambone regularly asked about the ethnicity of potential students they were attempting to recruit by linking the potential students' ethnicity to their ability to pay the $100 deposit.  Former Advisor Mara Leal testified that Giambone "would say that a Hispanic person, more like a Mexican, always had $100; Puerto Rican, a black person were always broke."  (Leal Dep., Doc. 74-8 at 26:6-9).  Leal also said Giambone would make such statements "[a]s often as I didn't close somebody, because I was supposed to be able to close my own kind.  I'm Mexican."  (*Id.* at 26:12-14).  Brooks testified that Giambone said to her, "'Well, Puerto Ricans never have any money and Mexicans always have their Catholic money.'"  (Brooks Dep., Doc. 74-2 at 47:1-3).  Likewise, Castro testified, "Every time we had an interview [Giambone] said, 'So, were they Mexican?  Did they have $100?  Oh, they didn't have $100?  They were probably Puerto Rican, or they were black.'"  (Castro Dep., Doc. 74-4 at 98:16-19).  Advisor Leo Lucio observed Giambone making similar comments "[w]henever we had interviews" and more frequently "when numbers were down."  (Lucio Dep., Doc. 74-12 at 42:2-5).  Florez testified that Giambone told him, "'Mexicans always have $100 in their mattress because it's communion money.'"  (Florez Dep., Doc. 74-3 at 168:5-6).  All five employees testified that they found Giambone's comments to be offensive and unprofessional, and that they repeatedly asked him to stop making them, to no avail.  (Castro Dep., Doc. 74-4 at 106:19-107:10; Lucio Dep., Doc. 74-12 at 42:12-24; Brooks

Dep., Doc. 74-2 at 48:17-50:5; Florez Dep., Doc. 49-11 at 167:7-23; Leal Dep., Doc. 74-8 at 27:5-20).

As further evidence of Giambone's offensive comments, Florez testified that in reference to a young Hispanic couple he interviewed, Giambone stated, "'How old are they?  You know, 18, 19 years old and they're married already?  Oh, she must be pregnant,'" which Florez construed to suggest "that Mexicans are underage, they get pregnant, and underneath the Catholic religion their parents make them get married…'" (Florez Dep., Doc. 74-3 at 168:22-169:5).  Also, on April 14, 2007, Florez asked Giambone for permission to take May 5th off from work to attend a wedding, to which Giambone responded by asking if Florez was going to "get drunk with your people, the Mexicans, on Cinco de Mayo for La Raza?"  (*Id.* at 198:14-24; 200:1-6).  Florez was offended by the remark and reported it to his supervisor, Castro, who also found it upsetting.  (*Id.* at 199:20-24; 200:21-23; Castro. Dep., Doc. 74-4 at 110:3-11).

Finally, Giambone assigned neighborhoods and leads based on race or national origin.  For example, Brooks testified that Giambone assigned her leads "from schools that were primarily on the south side, which are predominantly black schools."  (Brooks Dep., Doc. 74-2 at 50:6-51:2).  Similarly, Advisor Lucio testified that Giambone "always put the Black advisors in the Black neighborhoods, Latinos with Latinos[,] and Whites with Whites," and that he knew this to be true "[b]ecause [Giambone] told us."  (Lucio Dep., Doc. 74-12 at 39:10-17).  Leal, who is of Mexican heritage, testified that Giambone gave her "Spanish leads."  (Leal Dep., Doc. 74-8 at 30:15-23).

**E.    Plaintiffs Complain to HR on April 16, 2007 ("Protected Conduct")**

On April 16, 2007, Castro, Florez, and Brooks met with Alana Hurt from the Human Resources Department ("HR Officer Hurt") to complain about Giambone's deficiencies as a supervisor, including the offensive racial and ethnic remarks. (Castro Resp., Doc. 70 at ¶ 19; Florez Resp., Doc. 71 at ¶ 18; Brooks Resp., Doc. 72 at ¶ 16.). Since Plaintiffs do not challenge the accuracy of Hurt's typewritten summary of what occurred (this was confirmed during oral argument on the motions), the summary is included in its entirety:

> The above advisors [Brooks, Castro, and Florez] came to meet with me to voice their concerns regarding Phil Giambone. According to the advisors, Phil creates a "hostile environment" with derogatory comments and his "management by threats" attitude.
>
> There is an incentive program within the group whereby any advisor that has four applications by Thursday can take Saturday off. Mike Florez had four applications last week, but had to come into work, because he had scheduled appointments. He asked Phil if he could take another Saturday off instead. Phil asked which Saturday he wanted off. Mike asked for May 5 off. Phil laughed. He said, "Oh, yeah. I get it. You want to go celebrate with your people. La Raza . . . because it is Cinco de Mayo." [Mike is Mexican.] Mike replied, "Actually, I have a wedding to go to, and it's my wife's birthday."
>
> According to Mike, Phil constantly asks the ethnicity of applicants when he knows they have had interviews with students. He'll secondly ask, "Did you get the $100?" On more than one occasion if the student was of Mexican descent, Phil has remarked, "Well make sure you press them, because you know Mexicans always have $100 on them, guaranteed." This was corroborated by Liz [Castro] and Mara Leal.
>
> On another occasion Mike had a young couple come to see him. The girl was interested in attending DeVry. After they left, Phil asked if Mike had signed them both. Mike told Phil that they were a young couple (the girl was 18; her husband was 19) and had limited resources. They could not afford to both go to school. He told Phil the couple was just married and starting out. Phil remarked, "She's 18, and he's 19 . . . and they are

married? She must be pregnant, because you know Mexicans are really religious, and they will marry at an early age if the girl is pregnant." Mike said, "Why can't they just be married, because they are in love?"

LaTonya Brooks questioned Phil in a meeting, because there was a problem with them getting leads. The group was getting very old leads. After the meeting Phil approached LaTonya and told her that he needed to speak with her. He went on to say, "This business is all about loyalty. Your questioning me in the meeting embarrassed me in front of the team. If you want to get anywhere in this company, you need to show some loyalty, because I have Christine Hierl, Virginia Mechnig and Dave Pauldine in my back pocket. If you are not loyal to me, you will not be around very long." LaTonya felt like her job was threatened and vowed never to speak up in a meeting again.

Phil makes the advisors feel guilty for taking a vacation or personal day. He has asked advisors to come in on their vacation to work. He told them that he didn't understand why he had to give them Saturday, April 7 off. The Spring Holiday was on Friday. It is their regular day off. I told Phil to give them an alternative day off for the holiday. He told the advisors that "in his day they worked seven days a week."

They believe that Phil's lack of management skills has been the reason so many people have left. Furthermore, they believe people will continue to leave, as long as Phil is allowed to continue to behave the way he does. The morale of the team is extremely low.

(Def's Appx., Doc. 49-54). As Castro recalled at her deposition, Plaintiffs told Hurt about how Giambone made racial comments "every day" and about his "demotivating" and "demeaning" remarks towards people, his "unprofessional and rude" behavior, the fact that he didn't know how to distribute leads, and that he was hurting production. (Castro Dep., Doc. 49-9 at 102:22-105:15, 134:10-14).

Shortly after meeting with Plaintiffs, HR Officer Hurt called Maher, the director of HR, to tell her about the complaint. (Def's Reply to Pls' Rule 56.1 Statement ("Def's 56.1 Reply"), Doc. 84 at ¶ 23; Hurt Dep., Doc. 74-14 at 22:14-15). Hurt then investigated the complaint by composing 16 questions and posing these to three other

advisors from Giambone's team, including Mara Leal. (Hurt Dep., Doc. 74-14 at 24:9-17, 30:6-20, 31:21-32:22, Exh. 1; Leal Dep., Doc 74-8 at 63:7-65:16). These questions inquired as to the "greatest challenge" faced by the group and how they could be "more successful," and asked for an assessment of how the team was managed and the "climate of the work environment." Still other questions focused on whether the advisor had ever witnessed "any unprofessional conduct or inappropriate language."[2] (Hurt Dep., Doc. 74-14 at Exh. 2).

Upon the HR Director's suggestion, HR Officer Hurt informed Dean Hierl of Plaintiffs' complaint by providing her with the results of the investigation about a week after the complaint was made. (Hurt Dep., Doc. 74-14 at 44:4-45:3). After learning of the complaint, Dean Hierl informed Giambone about it, characterizing this as an example of Castro's negativity. (Pls' Add'l Facts, Doc. 69 at ¶ 35; Giambone Dep., Doc. 74-9 at 52:12-20). Hierl did not share the details concerning whom or what was said to HR. (Giambone Dep., Doc. 74-9 at 47:9-49:15). Giambone assumed the topic was something to do with production. (*Id.* at 48:11-16).

## F.    Giambone's Post-Complaint Conduct

Minutes after the April 16th meeting with HR ended, Giambone went to Castro's office looking "mad, like he was going to hit me," demanding to observe her do phone

---

[2]    Other questions included: How do advisors generally feel about the work schedule? How are your concerns addressed by management? Do you believe employees are comfortable airing concerns/issues? Why? Why not? Do you know the advancement criteria? How do you feel about the new compensation structure? Are department policies/procedures clearly defined? (Hurt Dep., Doc. 74-14 at Exh. 2).

work, telling her she was "never going to go to PRIDE[3] and [she was] not going to make [her] budget," and "furious[ly]" asking, "'Do you have anything to tell me? Do you want – anything you want to talk about?'" (Castro Dep., Doc. 74-4 at 142:9-143:14).

Castro and Florez perceived that Giambone then began restricting their leads. (*Id.* at 138:20-24; Florez Dep., Doc. 74-3 at 100:4-7). They began receiving "do not call" leads. (Florez Decl., Doc. 74-1, Tab C at ¶ 2.) They also ceased receiving ESM (electronic) leads, though there is no evidence as to whether they were unique in this respect.[4] Brooks testified generally that her "lead flow diminished" after the April 16th meeting, but also conceded that leads typically diminish "around June" when high school students are out of school. (Brooks Dep., Doc. 74-2 at 69:23-70:7, 71:22-72:19).

## G. Chicago Team Meeting on April 28, 2007

On April 28, 2007, Dean Hierl convened a team sales meeting attended by the Chicago team, including Plaintiffs. The meeting was motivated at least in part by Hierl's concerns "that we were not going to make budget." (Castro Dep., Doc. 74-4 at 151:15-22). Hierl wanted to "reiterate that we needed to stay on task and that we needed to … focus on our class." (*Id.*). This was a concern because, as Castro put it, "[t]he July class was our biggest class. It was our ultimate class. It was what we worked all year for." (*Id.* at 151:23-152:1). During the meeting Castro said that "'[o]ne of the main reasons why we're here today is because Joe [Mucinski] or Phil [Giambone] passed out

---

[3]        "PRIDE is an award issued to the top achievers in the company for all-around good performance." (Florez Resp., Doc. 71 at ¶ 12, citing Florez Dep., Doc. 74-3 at 77:10-18).

[4]        Castro states in her declaration that the office ESM binder showed that ADA Ramos's team had ESM leads while hers did not, but she did not provide the document upon which she relies. (Def's 56.1 Reply, Doc. 84 at ¶ 26). She also states that the office secretary told her that Giambone redirected the ESM leads. (*See id.*). This Court agrees with DeVry that the secretary's statements are inadmissible hearsay. *See* FED. R. EVID. 802.

sophomore leads. We need to be careful. We are recruiting seniors, not sophomores.'" (*Id.* at 150:1-23). After Castro made these remarks, Dean Hierl verbally attacked her for the comments to the point of reducing Castro to tears. (Pls' Add'l Facts, Doc. 69 at ¶¶ 32-33; Giambone Dep., Doc. 74-9 at 36:8-23). Castro attributes this reprimand to Hierl's racism since immediately after the meeting, Castro overheard Hierl say to Giambone in a stairwell, "'There's no way we're going to let a bunch of wetbacks run this office.'" (Castro Dep., Doc. 74-4 at 176: 6-14).

Several days after the April 28th meeting, Dean Hierl sent Castro a memo, with copies to Giambone and HR Officer Hurt. The memo noted that Hierl had convened the meeting due to "low" performance and "dismal" morale. The memo then criticized Castro for her conduct during the meeting in repeatedly ignoring Hierl's request to keep comments positive and for engaging in an "unprofessional and disrespectful rant" against Giambone and colleague Joe Mucinski. (Def's Appx., Doc. 49-27). In particular, she identified Castro's statement that she "'had to get something off [her] chest,'" which Hierl said was followed by criticism of Giambone and Mucinski, including the statement that "'we are in the position we are in because Joe and Phil weren't paying attention and dropped the ball.'" (*Id.*). After receiving the memo, Castro sent a note to Hierl in response stating that she did not feel she had acted inappropriately. (Castro Dep., Doc. 74-4 at 153:3-7).

Castro was very upset by the "wetback" comment and decided that she needed a transfer. (Castro Dep., Doc. 74-4 at 178:14-20). Two days later, on April 30, 2007, Castro submitted another transfer request for any opening for an ADA or DA position,

and indicated that she "would like to work closer to home." (Def's Appx., Doc. 49-28). Giambone signed off on the transfer request the same day. (*Id.*; Castro Dep., Doc. 74-4 at 154:1-156:10). Dean Hierl agreed to work with Castro to facilitate a transfer after the July class was seated (Castro Dep., Doc. 74-4 at 156:5-19), but later said she was not going to approve the transfer. (Castro Decl., Doc 74-1, Tab B at ¶ 8). The record does not indicate what reason, if any, Hierl gave Castro for her decision to deny the transfer request.

## H. Changes in Leadership/Offices in July 2007

In July 2007, Dean Hierl made a number of organizational changes. First, she replaced Giambone with Kathaleen Berry as the DA in the Chicago office. Berry already served in this position for the two suburban offices in Addison and Tinley Park but she now assumed responsibility for the Chicago office as well. (Hierl Decl., Doc. 49-3 at ¶ 11). Giambone was transferred out of the Chicago office and into the field where he resumed a prior position as High School Manager. (*Id.* at ¶ 10). At this point he ceased having supervisory authority over Plaintiffs or day-to-day contact with them. (Castro Resp., Doc. 70 at ¶ 32; Florez Resp., Doc. 71 at ¶ 29; Brooks Resp., Doc. 72 at ¶ 20). By August 2008, Giambone stopped working for DeVry entirely. (Offutt Decl., Doc. 49-5 at ¶ 4).

Also as part of Dean Hierl's organizational changes, Joe Mucinski, who had been a High School Manager, was demoted to an Advisor, reporting to Giambone. (Hierl Decl., Doc. 49-3 at ¶ 10). Hierl retained Lourdes "Lou" Ramos as an ADA in the Chicago office but ADA Julie Strauss, from the Tinley Park office, began spending more

time at the Chicago office to assist Ramos. (Florez Resp., Doc. 71 at ¶ 31; Brooks Resp., Doc 72 at ¶ 23). Hierl eliminated the second ADA position in Chicago (the one that Castro had held), and transferred Castro to the Addison office where she was demoted to Senior Advisor.[5] There Castro reported to ADA Karen "Casey" Tobin, who in turn reported to DA Berry. (Hierl Decl., Doc. 49-3 at ¶ 9; Castro Dep., Doc. 49-9 at 183:19-184:22, 199:9-17). Hierl maintained the pay of Castro, Giambone, and Mucinski at the same levels as before. (Hierl Decl., Doc. 49-3 at ¶ 12).

On July 11, 2007, after Castro's transfer, Giambone said to Florez: "'You see what happens to traitors like Liz [Castro], . . . I told you if you want to be someone in this company, you need to be loyal.'" (Florez Dep., Doc. 74-3 at 216:10-14). Castro believed she was demoted because "I went to HR, and they were going to use me as an example." (Castro Dep., Doc. 74-4 at 198:2-8). Dean Hierl testified that she wanted Castro out of the Chicago office because she was the "primary negative person" there. (Hierl Decl., Doc. 49-3 at ¶ 12). She largely blamed Castro for the office's performance problems as reflected by her comments in Giambone's performance review for the first half of 2007 (rated not meeting expectations), where Hierl wrote: "Although Phil made his March and May classes, July was a disaster. He was plagued with morale and personnel issues and this directly affected performance. Phil gave it his best shot to minimize the loss from July, unfortunately, with unmotivated advisors and manipulating Assistant Directors the class was too far gone." (Pls' Add'l Facts, Doc. 69 at ¶ 58;

---

[5]     As noted previously, Castro had requested a transfer to another office closer to her home, though she asked for a DA or ADA position. The evidence submitted by the parties does not specify where Castro lived at the time but Hierl believed she lived a short distance from Addison in Bensenville. (Hierl Decl., Doc. 49-3 at ¶¶ 9, 12).

Giambone Dep., Doc. 74-9 at 118:1-6). Giambone testified that he understood Castro to be the "manipulating" Assistant Director referenced in the review. (Pls' Add'l Facts, Doc. 69 at ¶ 58; Giambone Dep., Doc. 74-9 at 119:16-120:3).

After the staff changes in July 2007, Florez and Brooks remained in DeVry's Chicago office under the supervision of ADAs Strauss and Ramos and DA Berry. Castro worked out of the Addison office where she was supervised by ADA Tobin and DA Berry. Since the facts as to each Plaintiff diverge considerably after July 2007, this Opinion discusses these facts later as part of the analysis of each Plaintiff's retaliatory discharge claim.

## DISCUSSION

On September 15, 2010 (approximately one year after Castro's termination), Plaintiffs filed their joint two-count lawsuit. Count I sought damages for a "hostile work environment as a result of derogatory racial and ethnic statements being made by their supervisor." (Compl., Doc. 1 at ¶ 10). Plaintiffs now acknowledge that this claim must be dismissed. (Pls' Br., Doc. 73 at 13). Brooks and Florez waited too long to assert such a claim so it is time barred. *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1121 n.4 (7th Cir. 2009). Castro is estopped from recovering for such a claim due to omissions from a bankruptcy filing. *See Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 891 (7th Cir. 2005) (Judicial estoppel is an equitable doctrine that "prevents a party from adopting a position in a legal proceeding contrary to a position successfully argued in an earlier legal proceeding.").

Plaintiffs' lawsuit also alleged that they complained to DeVry's human resources department about the behavior of their supervisor in April 2007. (Compl., Doc. 1 at ¶ 11). "Following their complaint, each of the plaintiffs was subjected to retaliation, harassment and different terms and conditions of employment, including threats made by their supervisor specifically as a result of plaintiffs' having reported his conduct." (*Id.*, ¶ 12). But they seek to recover damages only for their terminations, alleging in Count II that they were fired in retaliation for their "protected conduct" and because of their national origin (Castro and Florez) and race (Brooks). (*Id.*, ¶¶ 14-16).

## A.    Summary Judgment Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.3d 202 (1986); *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001). The moving party bears the initial burden of identifying evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

To survive a defendant's motion for summary judgment, a plaintiff "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86,

106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986)).  In ruling on a motion for summary judgment, "[a] court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact."  *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008) (citing *Anderson,* 477 U.S. at 249-50).  The court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  *Anderson,* 477 U.S. at 255; *Arizanovska*, 682 F.3d at 702.

## B.    Title VII Retaliation Legal Standard

Since the hostile work environment claim is out of the case, this Opinion focuses solely on the retaliatory discharge claim.[6]  An employer is prohibited from discriminating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C.

---

[6]    Plaintiffs have not bothered to develop the evidence or arguments in support of the discrimination claims that are alleged in conclusory fashion in the lawsuit.  In opposition to summary judgment, Plaintiffs merely state with respect to these claims:

> There is evidence of discrimination based on national origin and race—the racist and xenophobic comments by Giambone, as well as the "wetbacks" statement by Christine Hierl. However, discovery shows that retaliation is the prime motivation. While plaintiffs will discuss this case largely from the perspective of retaliation, evidence of racial and ethnic animus by the individuals making the decisions in this case should also be considered by the court.

(Pls' Br., Doc. 73 at 13).  No jury could reasonably find that Plaintiffs were terminated because of their race or national origin based solely on the comments of Giambone and Hierl referenced above.  To the extent that Plaintiffs rely on evidence of racial or ethnic animus by others at DeVry, namely, the supervisors who initiated the terminations, they are required to discuss such evidence and provide record citations.  Since they have failed to do so, this Court declines to consider the discrimination claims and finds that they have been waived.  *United States v. Holm,* 326 F.3d 872, 877 (7th Cir. 2003) ("It is well settled that 'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.'").

§ 2000e-3(a); *see Milligan v. Bd. of Trustees of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012). "The antiretaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Milligan*, 686 F.3d at 388 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)).

A plaintiff may defeat a motion for summary judgment by establishing retaliation using either the direct or indirect method of proof. *Hoppe v. Lewis Univ.*, 692 F.3d 833, 841 (7th Cir. 2012). Here Plaintiffs' counsel clarified during the oral argument that they are relying only on the direct method. Under this method, a plaintiff must present evidence from which a jury could conclude that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse employment action; and (3) a causal connection exists between the two. *Id.* (citing *Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 664 (7th Cir. 2011); *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012). DeVry does not contest that the first two elements are satisfied here: Plaintiffs engaged in protected activity when they complained of Giambone's derogatory racial and ethnic comments (*Hoppe*, 692 F.3d at 842); and termination of employment constitutes an adverse employment action (*Harper*, 687 F.3d at 306). Thus, to defeat summary judgment, Plaintiffs need only show a causal link between the two. "[T]o put it another way, the plaintiffs must produce evidence that a 'retaliatory animus' motivated the defendants' adverse actions against them." *Brown v. Advocate S. Suburban Hosp. et al.*, 700 F.3d 1101, 1106 (7th Cir. 2012) (quoting *Smith v. Bray*,

20

681 F.3d 888, 901 (7th Cir. 2012)).

Plaintiffs may make this showing using either direct or circumstantial evidence. Evidence is direct when, "if believed by the trier of fact, [it] will prove the particular fact in question without reliance on inference or presumption." *Harper*, 687 F.3d at 307 (quoting *Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 714 (7th Cir. 1999)). "'Because direct evidence … essentially requires an admission by the employer,' such evidence 'is rare.'" *Harper*, 687 F.3d at 307 (quoting *Benders v. Bellows & Bellows*, 515 F.3d 757, 764 (7th Cir. 2008)). Plaintiffs in this case do not offer any such admissions. Instead, they endeavor to present a "'convincing mosaic of circumstantial evidence' that would permit the same inference without the employer's admission." *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (citing *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004), quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)) (internal quotations omitted).

Three categories of such circumstantial evidence have been recognized by the Seventh Circuit: (1) "'suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.'" *Harper*, 687 F.3d at 307 (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)); (2) evidence showing that similarly situated employees who did not engage in protected activity were treated better; and (3) evidence showing that a defendant's stated reason for taking action against the employee (here, terminating him or her) is not believable

and is a pretext for the real and discriminatory reason.  *Harper*, 687 F.3d at 307; *Coleman*, 667 F.3d at 860.

Plaintiffs argue that there is substantial evidence in each of these categories but examination of the record shows otherwise.  Plaintiffs lack evidence of suspicious timing given the many months between the protected conduct and the terminations.  They also are unable to identify any similarly situated employees who were treated better than they were.   Plaintiffs focus most heavily on attempting to show that their new supervisors' stated reasons for terminating them were pretextual.   This Opinion analyzes the pretext and other arguments specific to each Plaintiff below after summarizing the post-July 2007 evidence for each.  But first it examines the suspicious timing argument that is common to all Plaintiffs.

## C.    Suspicious Timing Argument Advanced by All Plaintiffs

Plaintiffs argue that a jury could infer a causal nexus between the protected conduct and the terminations because of suspicious timing.  Yet it is undisputed that Florez remained a DeVry employee for ten months after complaining to HR, Brooks remained fifteen months, and Castro remained twenty-six months.  This forecloses them from relying on suspicious timing or temporal proximity to make the required showing under the direct method.  *See Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (finding that "extended time gaps" of five weeks and two months between protected activities and alleged retaliation "militate against" inferring causation); *Harper,* 687 F.3d at 308-09 (finding gap of three and a half to five months between complaints and termination too lengthy to support inference of retaliation); *O'Leary v. Accretive Health,*

*Inc.*, 657 F.3d 625, 634-35 (7th Cir. 2011) (two-month gap between plaintiff's complaint and his termination was too lengthy to show causal nexus between the two); *Healy v. City of Chicago*, 450 F.3d 732, 741 n.11 (7th Cir. 2006) (finding no suspicious timing where adverse action took place more than a year after protected conduct). In any event, suspicious timing alone is rarely sufficient to create a triable issue in the absence of any corroborating evidence of retaliatory motive, and Plaintiffs lack such corroborating evidence here. *Smith*, 681 F.3d at 907 (finding that "short gap" of "a few months" between discrimination complaints and termination, absent any other evidence of retaliatory intent, does not support inference of retaliation) (citing *Coleman*, 667 F.3d at 860); *Harper,* 687 F.3d at 308-09.

In an effort to overcome the long gap in time between the protected conduct and their terminations, Plaintiffs focus great attention on alleged retaliatory acts of Giambone that occurred suspiciously soon after the complaint to HR in April 2007. Specifically, Plaintiffs stress testimony from Florez and Castro that they began receiving "do not call" leads and attributed this to Giambone; however, there is no admissible evidence that they were unique in this respect and, of course, Giambone's inability to effectively distribute leads was a concern before and during the meeting with HR in April 2007. (Castro Dep., Doc. 49-9 at 13:5-15). Regardless, even assuming Giambone retaliated against Plaintiffs by restricting leads or in other ways, it is undisputed that Giambone was entirely out of the picture within three months of the protected conduct and had nothing more to do with them. After this, their interactions were with entirely new supervisors: ADA Strauss and DA Berry (for Florez and Brooks) and ADA Tobin

and DA Berry (for Castro).  Had Giambone instead remained their manager and continued engaging in retaliatory acts until he eventually sought their terminations, the suspicious timing argument would perhaps have some force, but this is not what happened here.

Plaintiffs next try to equate this case with *Hasan v. Foley & Lardner, LLP*, 552 F.3d 520 (7th Cir. 2008), a discrimination case in which the Seventh Circuit reversed the district court's ruling that a gap of one year between a law firm partner's anti-Muslim remarks and the firing of a Muslim associate was insufficient evidence of discriminatory intent under the direct method.  Significantly, the partner who made the discriminatory remarks remained at the firm during this time, and "[t]he record shows that [the partner] attended the meeting at which the partners decided to fire Mr. Hasan and that he participated in that decision."  *Hasan*, 552 F.3d at 528.  The Seventh Circuit further noted that "[t]here is also evidence in the record that [the partner's] criticisms at that meeting incited anti-Muslim and racially charged commentary from other partners" who then "piled on" their own criticisms.  *Id.*  As a result, there was evidence directly linking the anti-Muslim comments to the termination decision.  Here, in contrast, there is no such direct link between the protected conduct and the termination decisions many months later.  To the contrary, the supervisor who made the offensive ethnic and racial remarks was transferred to a different position and location where he ceased all involvement with Plaintiffs long before the terminations.  And as discussed later, there is no evidence that the new supervisors who eventually sought to terminate Plaintiffs (ADA Strauss and DA Berry) were even aware of the protected conduct.

Plaintiffs also make a cursory argument that "[t]he law is very clear that, 'If the plaintiff has evidence from which one may reasonably infer that her former employer waited in the weeds for five or ten years and then retaliated against her for filing an EEOC charge, we see no difficulty with allowing the case to go forward.'" (Pls' Br., Doc. 73, at 17, citing *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 (7th Cir. 1996)). Of course, Plaintiffs offer no such evidence here – only speculation. Further, the statement quoted from *Veprinsky* is dicta from a footnote in which the court discussed a potential outcome to a hypothetical factual scenario. *Veprinsky*, 87 F.3d at 891 n.6. Plaintiffs cite no case in which a court has actually ruled in favor of a plaintiff in such a "waiting in the weeds" scenario, and this Court declines to do so here given the absence of evidence to support such a conclusion.

**D**.    **Supplemental Facts and Analysis for Plaintiff Florez**

**1**.    **Supplemental Facts**

During the six months following the complaint to HR in April 2007, Florez received another excellent performance review, another pay raise, and another PRIDE nomination. (Florez Resp., Doc. 71 at ¶¶ 37-39). After Giambone and Castro left the Chicago office in July 2007, Florez spoke with Dean Hierl about transferring out of the enrollment department to pursue an opportunity as an academic advisor outside the Chicago region. (Florez Dep., Doc. 74-3 at 84:6-21). Florez may have told Dean Hierl that he wanted to leave because Castro was not going to be there anymore. (*Id.* at 84:22-85:2). Hierl asked him to stay several times and was very positive about Florez. She said they needed him due to his numbers and could not make their starts without

him. If he stayed, Hierl said she would make him a mentor and get him a manager position when he was ready. (*Id.* at 83:11-20, 85:5-15). Florez decided to stay.

At his mid-year 2007 review, Florez received an overall rating of "significantly exceeds standards." (Def's Appx., Doc. 49-49). The review was approved by Dean Hierl and either Giambone or his successor, DA Berry. On the negative side, the review noted that Florez's average applications per week still needed to improve, as did his volume of quality phone work. (*Id.*; Florez Resp., Doc. 71 at ¶ 37). In October 2007, Florez was nominated by one of his new supervisors, ADA Strauss, for a PRIDE award. (Florez Dep., Doc. 74-3 at 95:8-13; Florez Resp., Doc. 71 at ¶ 39).

Not long after this, Florez and ADA Strauss had a "kind of a blowup with each other" (Florez's words) which resulted in Strauss giving Florez some very low ratings on the subjective (or "TEACH") assessment that month. (Florez Resp., Doc. 71 at ¶¶ 40-45, 52). Strauss reported what had happened to DA Berry, who called Florez a half-hour later and told him that his behavior was unacceptable and not to be repeated. She asked if she was clear and he said she was. (Florez Resp., Doc. 71 at ¶¶ 47-48 & Florez Dep., Doc. 74-3 at Exh. 15).

While he did not say this to DA Berry during the call, Florez felt that Strauss was the one at fault. That night he prepared a lengthy written complaint about Strauss's unprofessional behavior and gave it to HR Officer Hurt when he met with her the next day. (Florez Dep, Doc. 74-3 at 98:17-21; 99:11-19; Exh. 15). According to Florez's complaint to HR, he left his office in the afternoon to escort a student to the financial aid office. ADA Strauss questioned why he needed to do this. Florez said he believed in

customer service and could not afford to lose a student, to which Strauss responded: "Things are going to change around here, next time you point your student in the right direction, especially when you need to be on the phone during prime phone hours." (Florez Dep., Doc. 74-3 at Exh. 15).

Florez's complaint then described how later that day ADA Strauss asked him to call her on a "three-way" in the other office so she could observe him conducting phone work. There was static on the line that interfered with the calls so he asked Strauss to come to his office and listen to his calls. She declined and told him to keep calling. (*Id.*). The static continued so Florez again politely asked if she would be willing to listen in Florez's office. Strauss responded: "No you need to get another phone…you don't want me to go get it for you, do you?" (*Id.*). Florez then said he would get another phone and set it up. He did so but the static continued. At this point, Strauss said she would listen to him through the hallway with her door open. When Florez then left his office to get some water, the situation became more heated. He summarized what happened as follows:

> When I stepped out of my office Julie [Strauss] stated, "Where do you think your [sic] going?" I told her, "I am going to the refrigerator to get my water." She stated, "You better make it quick." So, I went back to my office and switched the cables to my original phone and continued to conduct phone work.
>
> Julie then comes in my office with her face as red as a cherry and says, "I think we have a fucking problem . . . Do we have a problem, you slammed the door on me twice. As of today your TEACH values are zero," while signaling with her hands a zero and leaves my office. When she was yelling at me frantically I was calm and stated, "I think there is a misunderstanding . . .," and continued to get cut off. I waited about 10 minutes [then] went to her office and knocked on her door. I went in and told her, "Julie, I really think there is a misunderstanding . . ." She would

27

not let me say a word, she then said, "Just get out of my office now, get out, get out. If you don't get out right now, I'm going to hit you so hard you won't even know what hit you." I was calm and collective [sic] and then said, "Excuse me? Are you threatening me?" She then said, "Just get out of my office now!"

(Florez Dep., Doc. 74-3 at Exh. 15).

In his complaint to HR, Florez also described the reprimand that he received from

DA Berry afterwards:

Within a half hour Kathy Berry gave me a call with Julie on three-way, she said, "Don't you ever disrespect one of my managers again and if I ever hear that you do there will be problems. If there is ever a problem again you take it and later you can discuss it with me. You are a PRIDE member and you are slamming doors and having temper tantrums. Never ever again, do I want to hear something like this again. Do you understand? Am I clear?" I just said, "Yes."

(*Id.*). Florez acknowledges that Berry's reaction was appropriate based on Strauss's report to her about what had happened. (Florez Resp., Doc. 71 at ¶ 48.)

ADA Strauss later prepared her own (and different) written summary of what happened, stating that Florez had slammed doors, thrown phones and addressed her in a disrespectful and inappropriate manner. (Florez Dep., Doc. 74-3 at Exh. 16; Def's 56.1 Reply, Doc. 84 at ¶ 93). As it must at this juncture, the Court credits Florez's version (although as discussed later, this has no bearing on the outcome of this motion). HR Officer Hurt investigated the incident but concluded that she could not corroborate the assertions of either Florez or Strauss. (Florez Resp., Doc. 71 at ¶ 51). As Florez remembered it, he and Strauss were told by HR to ignore what had happened and move on. (Florez Dep., Doc. 74-3 at 101:11-17). Former Advisor Mara Leal testified in her deposition that DA Berry asked her about the incident and Leal said Strauss was

the one who had slammed the door, yelled, and created a disturbance. (Def's 56.1 Reply, Doc. 84 at ¶ 101; Leal Dep., Doc. 74-8 at 71:1-23). DA Berry told Leal that she could have her old office back if, in the event HR contacted her about the incident, Leal said she had not seen anything. Leal agreed, told HR she knew nothing, and got her old office back.[7] (Def's 56.1 Reply, Doc. 84 at ¶ 101).

As she had threatened during the blowup, Strauss gave Florez multiple ratings of zero on his subjective "TEACH" performance assessment in October 2007. (Florez Resp., Doc. 71 at ¶¶ 45-46, 52; Def's Appx., Doc. 49-51; Florez Dep, Doc. 74-3 at 120:6-13). She noted in the commentary, for example, that Florez "helps current applicants get into class but does not focus on helping prospective applicants and therefore many leads are less than worked because he does not put appropriate time into phone prospecting." (Def's Appx., Doc. 49-51). In subsequent months, Florez's TEACH scores improved but "they weren't great like [he] had them before." (Florez Dep., Doc. 49-11 at 133:1-7).

On November 14, 2007, DA Berry sent Florez a memo stating that he missed his November 2007 start goal (achieving 5 starts on a target of 9), and that further unsatisfactory performance may result in disciplinary action, including termination.

---

[7]    Leal had vacated this office at DA Berry's request shortly after Berry and ADA Strauss became more involved with the Chicago office in July 2007. (Leal Dep., Doc, 74-8 at 56:5-56:21). When Leal asked why she needed to move, Berry said: "You don't ask me why. You just do what I tell you." (*Id.*). The new space was to the back and end of the office and across from Florez and Brooks. (*Id.* at 57:2-17). The old office remained vacant until Leal moved back in after making the deal with Berry. (*Id.* at 59:14-21). Plaintiffs highlight these facts because Leal was one of the Advisors who provided negative information about Giambone during HR's investigation in April 2007. They engage in pure speculation when they suggest that perhaps Leal was required to vacate her office in retaliation for what she said about Giambone. (Pls' Br., Doc. 73 at 26).

(Def's Appx., Doc. 49-52). When asked whether the memo about his failure to make his November starts was fair, Florez testified, "I guess you could say that." (Florez Dep., Doc. 49-11 at 229:12-15).[8] For the January 2008 class, Florez achieved his goal of 5 starts, though DA Berry and ADAs Strauss and Ramos initially tried to thwart him by saying that one of the students had to wait for the next class since the student had enrolled on the first day of the class. After Florez refused to back down and said he would go to DeVry's president if necessary, his supervisors told him to go ahead with enrolling the student if he felt he could make it happen, and he thus met his goal. (Florez Dep., Doc. 74-3 at 127:1-17, 128:9-18; Florez Resp., Doc. 71 at ¶¶ 55-56).

On January 31, 2008, DA Berry scheduled a phone observation of Florez. During this session, Florez began to challenge the zeros that Strauss had given him on his TEACH assessment a few months earlier. (Florez Resp., Doc. 71 at ¶ 59). Afterwards, Berry sent a memo to HR Officer Hurt (copying Dean Hierl) that summarized what she described as Florez's "45 minute diatribe":

> During the time when we were supposed to be accomplishing a phone observation, Mike insisted on talking about his TEACH values from October, he was strident and yelling, there were threats about lawyers and complaints to the EEOC. He insisted that he could not focus and do his job because of the ratings he received on his TEACH. He successfully made his class goals for January and his behavior and TEACH ratings had improved in both November and December. He wanted a mediation or a transfer. I advised him that a transfer was not possible and that I didn't know what he wanted me to mediate as the TEACH review had been done at the end of October and it was now the end of January. He continually rehashed an incident that had happened in October and that

---

[8]      In his Rule 56.1 response, Florez now asserts that the memo was unwarranted since it did not matter whether he met every bi-monthly goal given that he was ahead of pace for the year, as set forth in his performance appraisal covering the period of February through August 2007. (Florez Resp., Doc. 71 at ¶ 53, citing Florez Dep., Doc. 74-3 at Exh. 13).

had been investigated by Human Resources at the time. I told him the incident was in the past and to focus on the present and future. I asked him what he was trying to accomplish or what he wanted, by having this conversation now. He had no answer. He brought up that he was put on probation, even though no "Caucasians" in the region had been. I asked how he knew that. He had no real answer. There were strong undertones of racism and lawsuits, and he even asked if I would like to talk to his lawyer and that he was recording all conversations in his office. His attitudes and behaviors are disruptive to the entire office. These events take up both my time, without accomplishing anything, and his time when he should be accomplishing his job. This was a 45 minute diatribe. He then did not want to do the phone session as he was upset. I told him that it needed to be accomplished because I had carved time out of my schedule to do this. I talked to him about moving forward and being successful in his position. We proceeded with the phone session.

(Berry Dep., Doc. 74-10 at Exh. 4).

Florez testified at his deposition that Berry's summary of the discussion was "inaccurate" in certain ways but acknowledged that he complained to her about his TEACH values from October. He testified: "[M]y conversations with her were, basically, I had these zero TEACH values, they need to be changed." (Florez Dep., Doc. 49-11 at 134:1-14). Florez denied yelling at Berry, noting: "Kathy Berry is a lady to be feared, seriously. So I never raised my voice at Kathy once." (*Id.* at 133:14-20). Florez also denied making threats about lawyers or complaints or the EEOC. (*Id.* at 133:21-24). In the declaration that Florez submitted in opposition to summary judgment, he noted that the discussion with DA Berry lasted 5 to 10 minutes, not 45 minutes, before they returned to the phone session. (Florez Decl., Doc. 74-1, Tab C at ¶ 7). Shortly after this, Florez requested a transfer. (Florez Dep., Doc. 74-3 at 141:24-142:3). Again, this Court assumes for purposes of this motion that Florez's version is accurate.

After receiving the report from DA Berry about the "diatribe," HR Officer Hurt sent an email on February 4, 2008 to HR Director Maher indicating that Florez's supervisors wanted to discharge him and that she agreed with the decision. (Castro Decl., Doc. 74-1, Tab B at Exh. N). The email enumerated two specific problems: his inconsistent performance and his "volatile" behavior. The email then described the most recent "blow up" and his constant insubordination:

> His last "blow up" was with Kathy Berry last week. To refresh your memory, he is the employee who was going to Daniel Hamburger [President and CEO of DeVry Inc.] and Dave Pauldine [President of DeVry University and Executive VP of DeVry Inc.], because he did not feel he got resolution on the run-in he had with Julie Strauss a few months ago. He is also one of the people who complained about a previous supervisor (with Liz Castro).
>
> He is constantly insubordinate and challenging every decision his supervisor makes as racially motivated. Supervisors/managers feel that Mike's negativity adversely impacts the team and would like to separate him at this time. His coming review will be "Meets Standards". I agree with the supervisors. Let's discuss when you have a moment.

(*Id.*)

On February 15, 2008, Hurt sent Maher a follow-up email, stating:

> I have reviewed his semi-annual performance review. Although he "Meets Standards", I would like to move forward with separation. The totality of his review is that his performance is inconsistent, his inability to effectively follow the direction of his supervisors is a continuous problem and his refusal to accept management decisions will continue to impede his performance. While separating him is a risk, I feel comfortable that it is the right decision.

(Castro Decl, Doc. 74-1, Tab B at Exh. O).

DeVry terminated Florez about a week later, on February 21, 2008. (Florez Resp**.**, Doc. 71 at ¶ 62). Although Maher believes she approved the termination

decision, she has little recollection of it and, consistent with her general practice, did not generate any paperwork about her decision. (Def's 56.1 Reply, Doc. 84 at ¶ 109, citing Maher 20:18-21:19). On April 9, 2008, Florez filed a charge with the EEOC, alleging national origin discrimination (arising out of Giambone's offensive comments) and retaliatory discharge (for complaining about Giambone's offensive comments). (Florez Resp., Doc. 71 at ¶ 63; Def's Appx., Doc. 49-45).

**2. Arguments Specific to the Termination of Florez**

**a. Pretext:** Florez argues that a jury could draw an inference of a causal nexus between the protected conduct and his termination because ADA Strauss and DA Berry twisted and exaggerated the facts related to their clashes with him. Thus he argues "[a] reasonable jury could conclude that given the level of dishonesty engaged in by Berry and Strauss, no defense based on an 'honest belief' will fly here." (Pls' Br., Doc. 73 at 26). There are several problems with this argument. First, Florez acknowledges that he and Strauss had a "kind of a blowup with each other" (Florez Resp., Doc. 71 at ¶¶ 40-45, 52), so is not claiming that Strauss feigned the altercation. Nor does he deny that he filed a written complaint against Strauss afterwards in which he accused her of unprofessional behavior. Further, Florez admits that, given how Strauss described the altercation to DA Berry (saying Florez was at fault), Berry acted appropriately in reprimanding him. Finally, Florez concedes that Berry was again unhappy with him three months later when, during a time set aside for her to observe Florez on the telephone, he rehashed the old TEACH ratings given by Strauss and insisted they be changed. In other words, Florez admits that he clashed with Strauss

and Berry and that they were unhappy with him. What he quarrels with are the details concerning the clashes and, with respect to Strauss, who was at fault. Of course, the inquiry is not whether the employer's reasons are accurate or fair but simply honestly believed. *Coleman*, 667 F.3d at 852. Given the undisputed facts here, Florez is unable to establish that Strauss and Berry did not honestly believe he deserved to be terminated based on his behavior towards them.

Second, even if Florez were able to prove that DA Berry and ADA Strauss fabricated their reports concerning the altercations in order to create false reasons to terminate him, he still would need evidence linking their desire to terminate him to the protected conduct. In other words, he would need evidence that they fabricated their reports to cover up a retaliatory motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 516 (1993) (to establish pretext, plaintiff must show both that the reason was false and that it was a pretext for an unlawful motive, not merely that it was false); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 893 (7th Cir. 1999) (same); *Hauge v. Equistar Chem. Co.*, No. 02 C 0878, 2002 WL 1968390, at *5 (N.D. Ill. Aug. 26, 2002) (even assuming the decision-maker "fabricated" the supposed reason for plaintiff's dismissal, "[t]o establish pretext, [the plaintiff] must attribute a retaliatory animus to . . . the decision-maker"). Florez is unable to offer such evidence here. Instead, the evidence demonstrates that the decisionmakers neither knew nor cared about the protected conduct involving a prior supervisor almost a year earlier.

In terms of their knowledge of the protected conduct, the only evidence that Florez is able to marshal are isolated statements Berry and Strauss made at one

34

meeting with the Chicago staff in July 2007. Specifically, he notes Brooks's testimony that DA Berry said to everyone: "[D]on't go running off to HR, because I handle everything in-house. This is my team. Come see me." (Brooks Dep., Doc. 49-8 at 107:16-108:1). Florez did not testify about such a statement though he too was at the meeting. He did, however, testify that Berry told the staff that she was "loyal" to Giambone, Dean Hierl, and another person. (Florez Dep., Doc 74-3 at 156:2-9). He also recalled Berry remarking that she was a tougher manager than Giambone and that things were going to change, and he felt she was tougher than Giambone. (*Id.* at 91:12-21). As for ADA Strauss, Florez testified that after the staff meeting, Strauss met with Florez and Brooks and told them: "'Kathy Berry is different. Don't go to HR. If you go to HR, the people that have went to HR no longer work here.'" (*Id.* at 148:19-149:5). Brooks did not testify about such a statement.

At best such statements, if credited, would allow an inference that Berry and Strauss were generally aware that Florez and his co-plaintiffs complained in some manner about Giambone. There is no evidence, however, to suggest that Strauss or Berry became aware that they informed HR about offensive racial or ethnic remarks by Giambone. In fact, Plaintiffs never even inquired about this when deposing Strauss and Berry. Plaintiffs' counsel merely asked whether and when they learned of the "complaint." Strauss said she learned of it only after the lawsuit was filed. (Strauss Dep., Doc. 49-16 at 19:7-20:5). When Berry was asked by counsel whether she was aware that Plaintiffs "went to HR in April of 2007 to complain about Phil Giambone[,]" she said she learned this two to five months after assuming responsibility for the

35

Chicago office. (Berry Dep., Doc. 74-10 at 28:1-17). Plaintiffs' counsel *did* ask Giambone what he learned about the nature of the complaint. He said Dean Hierl did not share the details with him but he assumed it had something to do with production. (Giambone Dep., Doc. 74-9 at 47:9-49:15). He was right, at least in part. According to Castro, they complained to HR that Giambone did not know how to distribute leads and was hurting their production. They also complained that he: (1) made Advisors feel guilty about taking vacation and personal days; (2) lacked management skills; (3) threatened Advisors such as when he warned Brooks that she would not be around long if she embarrassed him again by complaining about old leads in front of the team; and (4) made derogatory racial and ethnic remarks. There is no evidence here allowing an inference that either ADA Strauss or DA Berry was aware of the complaint concerning the derogatory remarks prior to seeking Florez's termination.

Even if there were such evidence, Florez would still need to prove that the new supervisors sought to retaliate against him because of that protected conduct. But here it is undisputed that after Dean Hierl persuaded Florez to remain in the department in July 2007, Florez was given a review of "significantly exceeds standards" and ADA Strauss nominated him for a PRIDE award. It was only after Strauss and Florez had their blowup that Strauss gave Florez bad TEACH ratings. Strauss then was required to defend herself against Florez's complaint to HR for unprofessional conduct. Even assuming Strauss was dishonest with HR and slanted the facts concerning the blowup in her own favor, it is illogical to suggest that she did so to retaliate for the old protected conduct involving a former supervisor rather than to vindicate herself to HR and punish

Florez for reporting her. In the same vein, if DA Berry exaggerated or lied about the details of Florez's "diatribe" shortly before she sought his termination, it is completely speculative to suggest that she did so in retaliation for reporting Giambone to HR rather than for the much more recent conduct, including reporting Berry's second-in-command to HR for unprofessional conduct. Indeed, when asked at his deposition whether Florez felt he was terminated because of his complaint to HR against Strauss, he acknowledged: "That's part of it." (Florez Dep., Doc. 74-3 at 99:20-100:3). While Florez claimed the "racial comments that Phil Giambone stated" were also part of it, this is pure speculation so must be disregarded. *Harper*, 687 F.3d at 306.

In sum, Florez is completely lacking in evidence that the supervisors who wrote him up and sought his termination were aware of his protected conduct and sought to retaliate because of it. As the Seventh Circuit explained in *Brown v. Advocate South Suburban Hospital*, a plaintiff "must produce evidence that a retaliatory motive actually influenced the decision-maker, not merely that it could have[.]" *Brown*, 700 F.3d at 1108 (emphasis in original). In *Brown*, the dismissal of plaintiffs' retaliation claim on summary judgment was affirmed because the argument "for retaliatory animus relies entirely on speculation" and plaintiffs had offered "[n]o affirmative evidence suggest[ing] that the decision-makers were even aware of the plaintiffs' discrimination complaints before they denied the transfers, much less that they did so intending to retaliate against the plaintiffs." *Id.* (emphasis in original). The same is true here. Florez offers speculation rather than affirmative evidence to attempt to create the causal nexus between the protected conduct and his termination.

**b.** **Smoking gun:** Florez also argues that the February 4 email from HR Officer Hurt to HR Director Maher is a "smoking gun" that proves he was terminated in retaliation for the protected conduct since the email included the statement that Florez "is also one of the people who complained about a previous supervisor (with Liz Castro)." (Pls' Br., Doc. 73 at 10). As an initial matter, it is undisputed that DA Berry is the one who sought the termination after her own and ADA Strauss's recent altercations with Florez. As was just discussed, there is no evidence that Berry and Strauss were aware of the protected conduct and sought to retaliate because of it. Berry's decision was then run through HR for approval, leading to the exchange of emails within the HR department. HR Officer Hurt's email to HR Director Maher did not reference the complaint against the previous supervisor (ten months earlier) as a reason for termination. Nor did it say the prior complaint involved reporting offensive racial and ethnic remarks. Instead the email conveyed that Florez's current supervisors sought to terminate him based on his volatile behavior and inconsistent performance over the past three classes and that she agreed with the decision. While HR Officer Hurt reminded the HR director of a prior unspecified complaint that Florez made with Castro concerning a former supervisor, it is not surprising that such information would be shared within the HR department. Hurt explained at her deposition that her typical practice is to share such information and point out any risks associated with a termination decision. (Hurt Dep., Doc. 49-13 at 135:18-137:21). Under all the circumstances, HR Officer Hurt's email cannot reasonably be considered evidence that Florez was terminated in retaliation for the protected conduct. Florez remained at

DeVry for ten months after the protected conduct during which time he received an excellent performance review and the PRIDE award. It was only after Florez's admitted clashes with his new supervisors who knew nothing of the protected conduct, that DA Berry sought HR's approval to terminate him.

## E. Supplemental Facts and Analysis for Plaintiff Brooks

### 1. Supplemental Facts

Not long after the April 2007 complaint to HR, Giambone was required to evaluate Brooks and rated her as meeting standards during the first half of 2007. (Def's 56.1 Reply, Doc. 84 at ¶ 113). This was primarily based on the objective and numbers driven portion of the review. On the subjective portion of the evaluation, Giambone rated Brooks "Significantly Exceeds Expectations." (*Id.* at ¶ 114). While Brooks noticed that her "lead flow diminished" after the meeting with HR, she acknowledged that leads typically diminish in June when high school students get out of school. (Brooks Dep., Doc. 74-2 at 69:23-70:7, 71:22-72:19)

After July 2007, Giambone ceased to have contact with Brooks. She was then supervised by ADAs Ramos and Strauss who reported to DA Berry. When Brooks received her review in February 2008 (for the second half of 2007), she was again rated as meeting standards. (Def's 56.1 Reply, Doc. 84 at ¶ 117).[9] Admittedly, Brooks made only 5 of her target of 10 starts for the November 2007 class. (Brooks Resp., Doc. 72 at ¶ 32; Def's Appx., Doc. 49-18). She testified that "leads were low" and that she

---

[9] Brooks contends that the subjective component of her review, the TEACH values, dropped in the second half of 2007 but the document that she references does not support this. (Def's 56.1 Reply, Doc. 84 at ¶ 114).

believed DA Berry had revised the goal to five during a meeting with the Advisors in the Chicago office, telling them, "Please, if everyone can pull in five each, we will still make our target." (Brooks Resp., Doc. 72 at ¶ 32; Brooks Dep., Doc. 74-2 at 105:19-106:9). Berry issued a warning to Brooks for missing her targets for this class, as she had done to several others. (Brooks Resp., Doc. 72 at ¶¶ 32, 33; Def's Appx., Doc. 49-52).

Brooks's performance in 2008 was mixed. Brooks states that she had an overall target of 20 starts for the entire six months between January and July 2008 and that she surpassed the goal by enrolling 24 students; however, the document that she relies on indicates that Brooks had a target of 20 starts for the July 2008 class alone and achieved only 16 starts for that class. (Brooks Reply, Doc. 72 at ¶ 42, citing Maher Exh. 7, Doc. 49-57). As for the other classes, the document reflects the following targets and starts: January 2008 class (3 targets and 1 start); March 2008 class (4 targets and 4 starts); May 2008 class (2 targets and 0 starts). Brooks quarrels with some of these figures but acknowledges that she missed her target for the July 2008 class (by 4 starts) and this was the most important class of the year.[10]

Perhaps more significantly, on June 17, 2008, ADA Strauss and DA Berry received information from multiple prospective students that strongly suggested to them that Brooks had lied about her whereabouts and activities that morning. (Strauss Dep.,

---

[10]   As for the other classes, Brooks asserts that she had 6 starts in January (the most in the Chicago office) but relies on her own email stating this and an unidentified and unauthenticated exhibit. (Def's 56.1 Reply, Doc. 84 at ¶ 122, citing Castro Decl., Doc. 74-1, Tab B at Exh. F). For the May 2008 class, Brooks claims she had 4 starts, again citing an unauthenticated document. DeVry acknowledges that at least with respect to the number of applications completed (not starts) in the month of May 2008, Brooks was rated one of the "Top 21 Advisors (33 with ties)" in the country but notes that the starts are what matter most. (Def's 56.1 Reply, Doc. 84 at ¶ 124).

Doc. 49-16 at 91:2-92:24).   According to Strauss's writeup, Brooks called her at 12:30 p.m. that day and said she was en route to a "re-visit" with a prospective student scheduled for 1 p.m.   Brooks was 20 minutes away from the student's home.   (Strauss Decl., Doc. 84-14 at Exh. B.).   At 2:58 p.m. Strauss called the student to find out when he had last spoken with Brooks.   The student responded that he had not spoken with her since early that morning.   (*Id.*).   When Brooks arrived at work at 3:32 p.m., Strauss questioned her closely about her activities that day and concluded that Brooks had repeatedly lied.   Strauss summarized the basis for this belief in her writeup:

> 6-17-08 …Arrived 3:32p.m. at the Chicago campus.   LaTonya says she was with Brent Gaines conducting a re-visit and traffic was heavy.   I asked LaTonya what was accomplished at this visit and she said she re-motivated him to come to school.   I asked her if she had arranged a test date and time and she said she had not.   When I (Julie) questioned what she had done during all this time if she was not holding the student accountable she responded that she had been working all morning from home doing follow-up calls and Brent's re-visit.   *This re-visit did not happen.  LaTonya had stated that she had contacted several students that morning that she had not.   Kathy Berry was working her tracking log list and had spoken to all the students in question.   LaTonya has repeatedly lied and is not on task.*

(Strauss Decl., Doc. 84-14 at Exh. B) (emphasis added).

Brooks denies ever lying to Strauss about her whereabouts, a meeting with a student, a phone conversation with a student or any other event related to her employment.   (Brooks Decl., Doc. 74-1, Tab D at ¶ 4).   She also notes that Strauss never confronted her about the alleged dishonesty when she arrived at the office on

June 17th, as Strauss had done on a prior occasion.[11]   (Brooks Dep, Doc. 49-8 at 103:9-22).

On June 24, 2008, ADA Strauss raised other concerns with Brooks.  According to Strauss's writeup, Brooks was scheduled to interview a prospective student at 1 p.m. that day.  When the student was ten minutes late, Strauss asked Brooks if she would call the student to see if she was on her way.  Brooks "proceeded to say angrily that she had to do some other things first." (Strauss Decl., Doc. 84-14 at Exh. B).  Brooks then ignored what Strauss asked her to do.  When Strauss later asked Brooks to include Strauss on a three-way call to complete a follow-up observation, "[Brooks] visually was not happy with this and made every excuse in the book." (*Id*.).  Still later, "[Brooks] was visibly upset she was having to conduct any observation activity with [Strauss]." (*Id*.). After summarizing at length the specific details of what occurred, Strauss's writeup concluded: "It is a continual fight to get cooperation from LaTonya Brooks.  LaTonya will not use the improvement plan advice and continues to do what she wants to.  Latonya is not technically correct in her interview or phone prospecting activities." (*Id*.).  Brooks denies that the conversations described by Strauss ever took place.  She also notes that "Strauss has never told me that I was hesitant to cooperate, resistant to being observed doing phone work, or refused to follow instructions." (Brooks Decl., Doc. 74-1,

---

[11]    In October 2007, Strauss confronted Brooks about her claim that she needed to leave the office at 7 p.m. (during phone prospecting hours) to pick up a check from a student. (Brooks Resp., Doc. 72 at ¶ 29; Strauss Dep., Doc. 49-16 at 84:11-21).  Strauss informed Brooks that she had called the student's house and learned that Brooks had already picked up the check that morning.  According to Brooks, Strauss told her that "honesty is the best policy." (Brooks Dep, Doc. 49-8 at 103:9-18).  Brooks responded: "I'm being completely honest" and offered to call the student and her grandmother right then to clear up a miscommunication. (*Id*. at 103:18-22; Brooks Resp., Doc. 72 at ¶ 29).  Strauss said "No, that won't be a problem" and never raised the issue with Brooks again. (Brooks Resp., Doc. 72 at ¶ 29).

Exh. D at ¶ 5; Brooks Dep., Doc. 74-2 at 132:6-134:20). As it must at this juncture, the Court credits this testimony.

The next day, June 25, 2008, Strauss sent an email to Dean Hierl and DA Berry attaching her writeups about Brooks dated June 18, 2008 and June 24, 2008. Dean Hierl forwarded the email and attachments to HR Officer Hurt, stating "I want to either term her if you think I can or put her on month-to-month probation resulting in her term at the end of the July sales month. This is all for your info . . . tell me what you think." (Strauss Decl., Doc. 84-14 at Exhs. A, B; Brooks Resp., Doc. 72 at ¶ 40). Thirty minutes later, Hurt emailed back: "Can you send me a copy of the last review and the improvement plan mentioned?" (Strauss Decl., Doc. 84-14 at Exh. A). There is no indication that Hierl did so, nor is there any evidence addressing why Strauss referenced an improvement plan when no such plan existed. (Brooks Decl., Doc. 74-1, Tab D at ¶ 3).

On July 1, 2008, HR Officer Hurt emailed HR Director Maher about the "inconsistent" performance of Brooks, summarizing her target versus starts for classes in January, March, May, and July of 2008 (total target of 29 with 21 total starts). (Brooks Resp., Doc. 72 at ¶ 41; Def's Appx., Doc. 49-57). Hurt wrote: "We really need a more solid performer, especially for a Level II advisor. Would like to separate from the organization. We could live with a month-to-month probation, but we would be probably prolonging the inevitable." (Def's Appx., Doc. 49-57). A week later, on July 8, 2008, DeVry terminated Brooks's employment. (Brooks Resp., Doc. 72 at ¶ 43).

43

The following month, Brooks filed a charge with the EEOC alleging retaliation (for complaining about Giambone's offensive comments) and race and national origin discrimination (Giambone's offensive comments and his discriminatory lead distribution). (Brooks Resp., Doc. 72 at ¶ 50; Def's Appx., Doc. 49-21).

### 2. Arguments Specific to the Termination of Brooks

Like Florez, Brooks argues that the "dishonesty and deception" surrounding her termination would allow a reasonable jury to conclude that the stated reasons for her termination were a pretext to cover up the real and retaliatory reasons. (Pls' Br., Doc. 73 at 27). She notes in this regard that Dean Hierl said in the June 2008 email to HR Officer Hurt that she wanted "to either term [Brooks] if you think I can or put her on month-to-month probation resulting in her term at the end of the July sales month." Brooks contends that this shows Dean Hierl already had made up her mind to terminate her yet was suggesting probation as a "ruse to create the appearance that Brooks is being given a chance to survive." (*Id.*). Even accepting this, the real question is *why* Hierl made up her mind to terminate Brooks and go through the "ruse" (if necessary) of a probationary period: was it because of the protected conduct 15 months earlier or the recent and negative write-ups from ADA Strauss? Evidence of Hierl's willingness to engage in a "ruse" before terminating Brooks sheds no light on Hierl's motivation, much less establishes that the reason for the ruse was unlawful retaliation. Of course, as it turned out, Brooks was never placed on probation since HR Officer Hurt felt this would probably just be "prolonging the inevitable." (Brooks Resp., Doc. 72 at ¶¶ 40-41).

44

Brooks also notes that HR Officer Hurt went ahead with the request to terminate her even though Dean Hierl never sent Hurt a copy of the documents that she had requested: the last review (rating Brooks "Meets Standards") and the improvement plan (there wasn't one). (Pl's Br., Doc. 73 at 28; Hurt Dep., Doc. 74-14 at 122:12-123:12). Again to the extent Brooks is suggesting that the die was cast so such materials were unnecessary, this does not help establish the motivation for the decision. Brooks further argues that HR Officer Hurt "provided false numbers concerning Brooks's production over the last 4 start periods" in the July 1st email to Director Maher. (Pls' Br., Doc. 73 at 28). For reasons discussed previously, the evidence cited by Brooks does not support this claim. (*See supra* at 40 & n.10).

Brooks next suggests that there were "shifting" reasons for her termination because her "so-called acts of dishonesty" were not mentioned in Hurt's July 1st email, yet DA Berry testified at her deposition that this was the basis for termination." (Pl's Br., Doc. 73 at 28). While shifting reasons may indicate pretext, the facts do not support the claim of such a shift or pretext here. It is undisputed that ADA Strauss's writeups about Brooks raised both performance issues and concerns about dishonesty, and Dean Hierl forwarded these write-ups to HR Officer Hurt. The fact that Hurt stressed Brooks's poor performance in a subsequent email to HR Director Maher, whereas dishonesty was at the forefront of DA Berry's mind when she testified at her deposition years later, does not demonstrate "shifting" reasons for the termination. *See O'Connor*, 123 F.3d at 671 (although two of three communications about reasons for discharge focused on different aspects of conduct, the reasons given were not inconsistent and therefore did not raise

a fact question on pretext). To raise a suspicion of pretext, Brooks must present evidence of a "significant discrepancy" in the reasons offered by DeVry for her discharge. Concerns about dishonesty versus performance are not sufficiently inconsistent to show pretext. *See Juniel v. Park Forest-Chicago Heights Sch. Dist. 163*, 176 F.Supp.2d 842, 853 (N.D. Ill. 2001) (defendant's statement that it was honorably discharging the plaintiff as part of a reduction-in-force "was not sufficiently inconsistent" with its later statement that it terminated him for performance problems); *see also Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733-34 (7th Cir. 2001) (rejecting argument that employer's "alleged vacillation" in its reasons for its decision created a triable issue of pretext where defendant "simply supplemented its explanations in the context of EEOC charges and litigation," did not retract any of the reasons previously given, and none of its reasons were inconsistent or conflicting).

Finally, Brooks denies that she ever engaged in any dishonesty or other misconduct as ADA Strauss claimed in the June 2008 writeups, so argues that the reasons for termination must be pretextual. Of course, what matters here is not whether Brooks in fact engaged in misconduct or dishonesty but whether ADA Strauss and DA Berry honestly believed that she did based on their phone calls with prospective students. *Coleman*, 667 F.3d at 852. Brooks was not a party to those phone calls so is unable to testify concerning what the students did or did not say to Strauss and Berry about their contacts with Brooks. Moreover, even if this Court were to assume from the denials of Brooks that ADA Strauss lied in the writeups to cause the termination, Brooks still would need at least some evidence that Strauss did so in retaliation for the

protected conduct.  *See St. Mary's Honor Ctr.*, 509 U.S. at 516.  Perhaps a jury could infer this from pretextual reasons for the termination if Giambone were the person accusing Brooks of dishonesty and initiating the termination.   But as discussed previously, there is no evidence that ADA Strauss even knew that Brooks and her co-plaintiffs informed HR in April 2007 about a prior manager's offensive racial remarks. *See supra*, at 34-35.   And even if there were, Brooks would need at least some evidence from which a jury could reasonably infer that this knowledge motivated Strauss to retaliate by creating false reasons to terminate Brooks.  *Brown*, 700 F.3d at 1108.  Under all the circumstances here, it would be illogical and speculative to suggest that ADA Strauss desired to terminate Brooks because, more than a year earlier, she told HR about an old manager's derogatory ethnic and racial remarks.

**F.    Supplemental Facts and Analysis for Plaintiff Castro**

>    **1.    Supplemental Facts**

**2007:**  In July 2007, Castro was transferred to the Addison office where she was supervised by ADA Tobin who reported to DA Berry.   (Castro Dep., Doc. 74-5 at 251:10-13).   After learning of her demotion to Senior Advisor (with no pay reduction), Castro emailed Dean Hierl to meet and talk about it and Hierl agreed.  (Castro Dep., Doc. 74-4 at 197:4-15).   But on July 17, 2007, the day she was to begin work at the Addison office, Castro was in a car accident and took a medical leave for approximately the next two months until September 11, 2007.  (Castro Resp., Doc. 70 at ¶ 40).

When she reported for her first day of work in the Addison office on September 11, 2007, someone (the record does not reflect who) assigned Castro to office space in

a converted closet where supplies were kept, even though there were two available offices in another department down the hall. (Castro Dep., Doc. 74-5 at 249:1-23). Castro was also "assigned to be in the office every Saturday while the other advisor, Barbara Watson, only worked occasional Saturdays when necessary for a specific task." (Castro Decl., Doc. 74-1, Tab B at ¶ 13). ADA Tobin made the decision about who worked Saturdays. Castro testified that she did not know why Tobin made her the "Saturday person" and had no idea whether Tobin knew of Castro's complaint against Giambone. (Castro Dep., 251:10-23).[12]

Two weeks after she returned to work, DA Berry delivered Castro's review that had been prepared by Giambone covering performance for classes before July 2007. (Castro Resp., Doc. 70 at ¶ 41). On the subjective portion, worth 40%, Castro received an overall rating of 3.03, or "significantly exceeds expectations," however on the objective, numbers-driven portion, worth 60%, she received an overall rating of 0.60, or "unsatisfactory." (Def's Appx., Doc. 49-30). Due to the low score on the objective portion, her overall performance rating was 1.57, or "does not fully meet standards." (*Id.*). DA Berry warned Castro not to complain to HR about the review or to call Dean Hierl, stating: "Don't even think about calling [Hierl]. She doesn't want to hear from you, she doesn't want to talk to you. Anything you need, go through me." (Castro Dep.,

---

[12]     Because it is inconsistent with her deposition testimony, this Court disregards Castro's subsequent statement in her declaration that she specifically asked Tobin in the summer of 2008 why Castro was always requested to work Saturdays and Tobin told her "not to question her decision, because [Castro] was a failed manager and Tobin was following orders from Berry and Hierl." (Castro Decl., Doc. 74-1, Tab B at ¶ 13). *See Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996) (holding that "the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony.")

Doc. 74-4 at 234:14-20). This 2007 review did not credit Castro's team with 11 starts secured by Advisor Neil Posmer, which were supposed to be credited to her team per an informal agreement reached with Giambone at a weekly team meeting. (Castro Decl., Doc. 74-1, Tab B, ¶ 17 & Exh. J).[13]

After returning to work and receiving the above review in September 2007, Castro worked approximately one and a half months before starting a second leave of absence. This leave, from October 23, 2007 until January 10, 2008, was taken "on the recommendation of her doctor due to stress, depression, headaches and panic attacks brought on by defendant's retaliation." (Castro Resp., Doc. 70 at ¶ 44). While she was gone, Castro filed her first EEOC charge (on January 3, 2008), alleging discrimination based on her national origin (Mexican) and retaliation. In regard to the latter charge, Castro wrote: "Since my last promotion, I was subjected to ethnic and racial comments. I complained to Respondent, consequently, I was demoted, transferred to another facility, and I was subjected to different terms and conditions of employment." (Def's Appx., Doc. 49-31). During her deposition, Castro testified that the different terms and conditions of employment consisted of being put in a closet for an office with no leads in her portal (as if she were a new employee), and being denied the opportunity to participate in PRIDE despite her high numbers. (Castro Dep., Doc. 74-5 at 248:6-23).

**2008:** Upon her return to work on January 10, 2008 after the second leave of absence, ADA Tobin maintained a log of Castro's activities in the office, noting times of

---

[13]     Castro contends that had these starts been applied, her rating would have been "Meets Standards." (Pls' Add'l Facts, Doc. 69 at ¶¶ 54-57). But this assertion relies entirely upon Castro's unsupported speculation about the application of DeVry's Advisor Compensation Plan, rather than on factual statements contained in the plan. (*See* Def's Reply, Doc. 84 at ¶¶ 53-57).

arrivals and departures and other minutia. Tobin did not maintain a log like this for the other advisor in the Addison office. (Pls' Add'l Facts, Doc. 69 at ¶ 60, citing Tobin Dep., Doc. 74-7, Exh. 3). Also in January 2008, DA Berry denied Castro's request for leads for prospective students for DeVry's online classes, telling her that such leads were restricted to the online group pursuant to a policy change. (Castro Resp., Doc. 70 at ¶ 54).[14] Castro believed ADA Tobin was the one responsible for distributing leads in the Addison office. (Castro Dep., Doc. 49-9 at 253:9-15).

Given Castro's extended absence from work, DA Berry agreed to reduce (prorate) Castro's start goal from 39 to 31 in total for the period covering the four classes from January through July 2008. (Castro Resp., Doc. 70 at ¶ 57; Def's Appx., Doc. 49-35). Castro says her goals were never prorated despite being on leave for 84 days (work on the July class started in September of the prior year). (Pls' Add'l Facts, Doc. 69 at ¶¶ 61, 62). While Castro's goal of 25 starts for the July class was not prorated, her goals were prorated to 0 for January, 4 for March, and 2 for May. (Def's Appx., Doc. 49-35). DeVry's handbook contains no proration policy and Berry was told by the corporate home office that DeVry does not prorate. (Berry Dep., Doc. 74-10 at 34:6-15, 37:5-11). DA Berry testified that "[i]t wasn't an official proration," but rather she agreed to prorate Castro's start goals "because [Castro] was very unhappy about it and I wasn't trying to be unfair to her." (*Id.* at 37:5-11). Castro felt that Berry should have reduced her start goal further than she did. (Pls' Br., Doc. 73 at 25).

---

[14]    The Court declines to consider Castro's testimony about what Advisors Barb Watson and Johnny Vaughn allegedly told her concerning such leads since Castro offers these hearsay statements for their truth. (*Id.* at ¶ 54). As such they are inadmissible. *See* FED. R. EVID. 802.

On August 19, 2008, DA Berry sent a memo to Castro advising that Castro "missed [her] July 2008 class with 15 starts on a target of 25, which was "unacceptable" and that she "will be held responsible for immediate and substantial improvement." (Def's Appx., Doc. 49-32). The memo stated that "[f]urther displays of unsatisfactory performance may result in disciplinary action, up to and including termination." (*Id.*) Castro did not meet her start goal for the September 2008 class, and she received a poor mid-year performance review that month, though she contends this stemmed at least in part from her goal being inadequately prorated. (Castro Resp., Doc. 70 at ¶¶ 61, 62). In her comments on Castro's mid-year review, ADA Tobin noted that Castro "is consistently requesting additional lead flow, even though others in her office are making volume goals with the same amount of lead flow she receives." (Doc. 49-33 at 17). When confronted with this statement in her deposition, Castro testified, "I don't know about other people in the office. I couldn't speak to that." (Castro Dep., Doc. 49-10 at 311:19-312:7).

On August 28, 2008, Castro sent an email to DA Berry with a copy to Dean Hierl in which she argued that her goals should be prorated because she had been on medical leave. She said she did not understand how Rick Borowiak[15] or Christine Hierl could deny her a proration. The email attached some prior emails between Castro and Berry discussing proration issues as far back as January 2008. (Def's Reply, Doc. 84 at ¶ 63, citing Offutt Dep., Doc. 74-11 at Exh. 2). Dean Hierl forwarded the email to HR Officer Doug Offutt, stating:

---

[15] The record does not indicate who Rick Borowiak is. The Court assumes that he is another DeVry manager.

> I would prefer if all correspondence between Liz Castro and Chicago DEM goes through you. I have a long history with her, am named in her EEOC claim and frankly am not comfortable with her for many reasons.
>
> Her issue is way above Kathy Berry or myself. OBT Performance Management dictates what happens. Please advise how you want me to proceed. I will not be responding to any of her e-mails.

(Offutt Dep., Doc. 74-11 at Exh. 2).

Less than a month later, on October 20, 2008, Castro took a third leave of absence (a maternity leave) that lasted until January 12, 2009. (Castro Resp., Doc. 70 at ¶¶ 63, 65). She failed to meet her start goal for the November 2008 class, which commenced less than two weeks after she began her leave. (*Id.* at ¶ 64). On November 13, 2008, while on the maternity leave, Castro filed a second EEOC charge, this time alleging sex discrimination based on her pregnancy and in retaliation for filing the January 2008 EEOC charge. She alleged that the retaliatory acts were harassment and placement on a performance improvement plan. (Def's Appx., Doc. 49-36). In the EEOC intake questionnaire, Castro complained that her starts had not been prorated because she filed a previous charge with the EEOC. She also wrote that she was expecting a baby and would be off work. At her deposition, Castro explained that she was making the point that DeVry had not prorated her goals when she was on her prior FMLA (Family and Medical Leave Act) leave and now she was on another leave. (Castro Dep., Doc. 49-10 at 315:15-317:9).

**2009:** When Castro returned from maternity leave on January 12, 2009, her start goal for the March 2009 class was prorated but not her goals for the May and July 2009

classes. (Castro Resp., Doc. 70 at ¶ 65).[16]  In addition, ADA Tobin removed Castro's name from the paperwork for three of Castro's starts during this period and reassigned them to Tobin and another Advisor. (*Id.*)

On May 19, 2009, DA Berry issued a memo to Castro describing Castro's failure to meet her performance goals and emphasizing the importance of meeting her July 2009 target of 24 starts. (Def's Appx., Doc. 49-38). Castro testified that she met with DA Berry, ADA Tobin and HR Officer Offutt to go over expectations and asked if she could transfer to a different department after the July class because the "harassment here has gone beyond the normal scope, and I would like for you to put that in writing." (Castro Dep., Doc 74-5 at 333:13-17).

In June 2009, Castro completed another transfer request but ADA Tobin and DA Berry refused to sign it. (*Id.* at 337:11-16). A short time later, Castro took a fourth leave of absence, this one lasting from June 18, 2009 until August 5, 2009. (Pls' Add'l Facts, Doc. 69 at ¶ 64). Castro attributed this leave to depression stemming from how upset she became when she realized that she was not going to get a transfer. (*Id.*, citing Castro Dep., Doc. 74-5 at 338:21-339:6). Castro testified that she also experienced headaches, anxiety, and panic attacks due to her treatment at DeVry. (Castro Resp., Doc. 70 at ¶ 68; Castro Decl., Doc. 74-1, Tab B at ¶ 35).

---

[16]     DeVry offered evidence (an email from ADA Tobin to Castro and DA Berry) that Castro's start goals were prorated for the May and July classes, and that a written compensation plan dictated the number of starts assigned to Advisors. (Def's Appx., Doc. 49-37; Def's Reply, Doc. 84-9). Castro takes issue with this, asserting that the plan provided discretionary guidelines for managers, which generally were not followed. (Castro Resp., Doc. 70 at ¶ 66; Castro Decl., Doc. 74-1, Tab B at ¶ 34). For purposes of this motion, the Court considers the facts in the light most favorable to Castro.

On June 23, 2009, about a week after starting the fourth leave of absence, Castro filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court. (Castro Dep., Doc. 74-5 at 339:19-340:9; Def's Appx., Doc. 49-39).  Her petition made no mention of any claims against DeVry even though she had two charges still under investigation by the EEOC.  (Def's Appx., Doc. 49-39).  Consequently, Castro now acknowledges that she is estopped from recovering for the hostile environment alleged in Count I or any other acts that occurred prior to the bankruptcy filing.  She seeks to recover only for her termination.  (Pls' Br., Doc. 73 at 13).

Upon Castro's return from her fourth leave on August 5, 2009, DA Berry retroactively prorated Castro's start goal for the July 2009 class, reducing the goal from 24 to 16 starts, which Castro achieved.  (Castro Resp., Doc. 70 at ¶ 72).  Berry also prorated Castro's September 2009 start goal from 20 to 10 starts, but Castro achieved only 3 starts for the September 2009 class.  (*Id.* at ¶ 73).  Castro emphasizes that no one on ADA Tobin's team met their September 2009 goals other than Tobin herself, though only Castro's starts were prorated.[17]  (*Id.*; Castro Decl., Doc. 74-1,Tab B at ¶ 22, Exh. D.)

On August 27, 2009, DA Berry placed Castro on probation in anticipation of her not making her September 2009 start goal, given that Castro was forecasting 3 starts on a prorated target of 10.  (Def's Appx., Doc. 49-40).  On September 1, 2009, Castro received a poor mid-year review based on her failure to meet production goals.  (Castro

---

[17]  Castro also asserts that her starts would have been the same as three other Advisors if she had not missed 60% of the period due to illness.  But this assertion is based on speculation and unsupported assumptions.  (Pls' Add'l Facts, Doc. 69 at ¶ 81).

Resp., Doc. 70 at ¶¶ 74, 75; Def's Appx., Doc. 49-41). Castro asserts that her production numbers were good given the denial of leads (distributed by ADA Tobin), and her leave during this period. (Castro Resp., Doc. 70 at ¶ 75; Castro Dep., Doc. 49-9 at 253:9-15). She also asserts that she received her lowest numerical scores in the subjective categories, even though the narrative comments in those categories were largely positive. (Castro Resp., Doc. 70 at ¶ 75; citing Def's Appx., Doc. 49-41 at 2). The review indicates that she received an overall score of 1.4 out of 4.0 on the subjective ("TEACH") component, and 1.8 out of 4.0 on the objective ("Productivity") component. (Def's Appx., Doc. 49-41 at 4).

About two weeks later, on September 9, 2009, DA Berry sent Castro an email identifying Castro's failure to achieve the appointment, interview, and application goals required by her probation, and stating that it "is vitally important for you to increase your activity to meet the probation requirements." (Castro Resp., Doc. 70 at ¶ 76; Def's Appx., Doc. 49-42). On October 26, 2009, Berry recommended that Castro's employment be terminated based on her performance. (Castro Resp., Doc. 70 at ¶ 77; Def's Appx., Doc. 49-58). HR Director Maria Wrobel approved the recommendation, and DeVry terminated Castro's employment on November 3, 2009. (Castro Resp., Doc. 70 at ¶ 77; Ans., Doc. 11 at ¶ 15).

On February 3, 2010, Castro filed a third EEOC charge, alleging retaliation. In support of the charge, she wrote: "I have filed two charges of discrimination against Respondent… Since filing the charges, I have been harassed and subsequently

discharged, effective November 3, 2009.  I believe I have been retaliated against for engaging in protected activity…."  (Def's Appx., Doc. 84-15).

Approximately seven months later, on September 15, 2010, the lawsuit was filed, alleging Castro was terminated in retaliation for complaining to HR about her supervisor's "derogatory racial and ethnic statements" in April 2007.  (Compl., Doc. 1, ¶ 10).

### 2.    Arguments Specific to the Termination of Castro

**a.    Pretext:** Castro attempts to create an inference of retaliation by offering evidence that DA Berry's stated reasons for seeking the termination (poor performance) are not believable and were a pretext for retaliation.  Castro argues in this regard that she received negative performance reviews only because of the denial of leads and because her start goals were set too high and not sufficiently prorated given her multiple leaves of absence.

The evidence does not support Castro's claim that she was stymied in her effort to reach her goals because she received fewer or worse leads than other employees or because of her protected conduct.   This Court already has discussed the lack of evidence that Giambone restricted her leads in the Chicago office after the protected conduct.  *See supra*, at 23-24.  Even if one assumes Giambone *did* restrict leads in retaliation, he admittedly was gone by July 2007.  As for the distribution of leads in the Addison office after Castro's transfer there in July 2007, DA Berry testified that leads were distributed by computer in round-robin fashion.  (Berry Dep., Doc. 49-7 at 102:5-103:21).  The only additional evidence that Castro offers to dispute this assertion is her

personal observation that Advisor Barb Watson from that office had 5,600 leads when Castro had only 58. (Castro Resp., Doc. 70 at ¶¶ 48-50; Castro Dep., Doc, 74-5 at 336:12-337:1). But Castro admitted that she had no idea how old those leads were so it was possible that the leads were old ones that never had been deleted from Watson's computer. (Def's Reply, Doc. 84 at ¶ 51). In addition, when asked why Watson would be assigned such a massive number of leads, Castro's only explanation was that management "liked Barb, so they took care of her" and "wanted to make sure she had enough leads to be successful and make her numbers." (Castro Dep., Doc. 74-5 at 337:2-6). Castro did not assert that Watson was given more leads because, unlike Castro, she had not engaged in protected conduct. (Castro Resp., Doc. 70 at ¶ 48).

Moreover, in her response to DeVry's Rule 56.1 Statement, Castro admitted that she does not know who distributed leads but believes it was ADA Tobin. (Castro Resp., Doc. 70 at ¶ 48). There is no evidence that Tobin had any knowledge of Castro's complaint to HR concerning Giambone. Castro's bald assertion that ADA Tobin gave her worse or fewer leads than other employees is disregarded since it is without any record support. Of course, even if there were evidence that Tobin treated Castro unfairly and wanted her to fail by depriving her of leads (hurting Tobin's own compensation), Castro still would need at least some evidence linking Tobin's behavior to the protected conduct involving Giambone. There is no such evidence here.

As for the contention that Castro was given higher start goals and these were not sufficiently prorated, Castro acknowledges that she was a Senior Advisor and a highly experienced "veteran" advisor, so was appropriately held to a higher standard and

expected to generate more enrollments. (Castro Resp., Doc. 70 at ¶ 59). It is also undisputed that DeVry had no proration policy in its handbook, and that DA Berry was told by the corporate home office that DeVry does not prorate. Indeed former Advisor Mara Leal testified that there was "no such thing" as prorating, and that she was held to her full goal after returning from a six-week leave for surgery. (Leal Dep., Doc. 74-8 at 54:1-19). Castro herself was not aware of any instance in which either DA Berry or HR Officer Doug Offutt, who was working with Berry on the proration issue, ever prorated an employee's goals prior to doing so for Castro in late 2007. (Castro Resp., Doc. 70 at ¶ 60). Further, Castro acknowledges that "prorating goals requires discretion and judgment by the manager prorating the goals" and "there is no magic number or formula." (*Id.*, citing Castro Dep., Doc. 74-4 at 345:8-17).

Here DA Berry exercised her discretion and reduced Castro's start goals a number of times. Given that Castro was not entitled to any proration at all under DeVry policies and is unable to point to any other employee who received a more generous (or any) proration of goals, her argument of pretext based on insufficient proration is unpersuasive. *See Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1114 (7th Cir. 1998) (finding that defendant's decision not to issue a counseling statement to plaintiff prior to termination was not evidence of pretext because company policy made issuance of such a statement discretionary); *Holman v. Revere Elec. Supply Co.*, No. 02 C 6351, 2005 WL 638085, *23 (N.D. Ill. Mar. 15, 2005) (finding no triable issue on pretext concerning defendant's failure to follow company's progressive discipline policy where such policy was discretionary).

Even if Castro were somehow able to prove that DA Berry's termination decision was pretextual, it is still a leap to link her actions to the protected conduct involving Giambone. *See St. Mary's Honor Ctr.*, 509 U.S. at 516 (to establish pretext, plaintiff must show both that the reason was false and that it was a pretext for an unlawful motive, not merely that it was false). As discussed previously, there is no evidence that Berry was aware of the protected conduct. *See supra*, at 34-35. If she was aware that Castro complained about her former supervisor's offensive racial remarks in April 2007, it is pure conjecture to suggest that this motivated Berry to treat Castro unfairly or dishonestly in order to terminate her more than two years later. This is especially so given all the other and more recent events that could have given rise to a desire on Berry's part to terminate Castro (apart from poor performance). Among other reasons, Castro took no fewer than four leaves of absence (totaling approximately 267 days or nearly 9 months) between July 2007 and August 2009.

Castro is also unable to show pretext given the evidence that she repeatedly failed to meet her numerical targets even with the benefit of proration in some instances. Indeed, for the final class prior to her termination (September 2009), Castro's start goal was cut in half (from 20 to 10) yet she enrolled only 3 students. (Castro Resp., Doc. 70 at ¶ 73). Prior to this, she missed her start goals for classes in July 2008, September 2008, and November 2008. (*Id.* at ¶¶ 61, 64, 73; Def's Appx., Doc. 49-32). In addition, Castro, was rated "unsatisfactory" on the objective, numbers-driven portion of her July 2007 performance review, received a poor mid-year review in September 2008, and another poor mid-year review in September 2009 due to her

failure to meet her production goals. (Castro Resp. at ¶¶ 41, 62, 74-75, Def's Appx., Doc. 49-32). There is no evidence that Castro's objective performance was comparable to her colleagues, let alone better as she acknowledges it needed to be given her seniority.

        **b.** **Similarly Situated Employees:** Castro fares no better in her attempt to create an inference of retaliation by identifying "similarly situated" employees who she contends were treated more favorably than she was. One of these individuals was a remote Advisor in Iowa, Christine Ridge, and the other was an Advisor IV in the Tinley Park office, Glenn Whalen, who reported to a different ADA (not Tobin). Castro testified that she believed these advisors "were treated better because they were really good friends with Tobin and, in Whalen's case, Berry, as well." (Castro Resp., Doc. 70 at ¶ 80; Castro Dep., Doc 49-10 at 357:16-358:9). Since Castro acknowledges that these two individuals were treated better because they are "good friends" with their supervisors, they are not valid comparators. Beyond this, these individuals worked in other offices and reported to other supervisors. And Castro provides no evidence concerning their performance vis-à-vis her own in order to allow this Court to make a comparison. Generally a plaintiff "must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Coleman*, 667 F.3d at 847 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

**c.    Retaliatory Acts of Giambone and Hierl:** While Castro seeks to recover solely for the "retaliatory" termination that DA Berry initiated in late 2009, she highlights innumerable unfair acts, decisions, and statements by an assortment of people over the two and one-half years that she remained at DeVry following the protected conduct.  She particularly focuses on such acts shortly after the protected conduct to try to overcome the lack of temporal proximity between the protected conduct and her termination.  This Court has already addressed the alleged retaliation by Giambone.  *See supra*, at 23-24.  As for Dean Hierl, there is no question that there was friction between Hierl and Castro before and after the protected conduct.  In March 2007, Hierl told Castro that she was overpaid given her production level.  (Castro Resp., Doc. 70 at ¶ 17).  She also verbally attacked Castro at a team meeting (on April 28, 2007) after Castro was openly critical of Giambone and Mucinski for their distribution of leads.  (Pls' Add'l Facts, Doc. 69 at ¶ 33).  Hierl even called Castro "manipulating" in Giambone's performance evaluation, and she demoted Castro in July 2007, citing her negativity.  (*Id.* at ¶ 58; Hierl Decl., Doc. 49-3 at ¶ 9).

But even if the Court gives Castro the benefit of the doubt and assumes that the reason Dean Hierl took these actions was a desire to retaliate for the protected conduct, this does not help Castro survive summary judgment.  Castro is not suing for the demotion or other actions of Giambone or Hierl in July 2007 but rather for her termination in November 2009.  Castro provides no evidence that Hierl had any role in the termination decision or the events leading up to it.  Indeed, Hierl not only avoided contact with Castro at least as early as August 2008 (*see* email to HR Officer Offutt,

Offutt Dep., Doc. 74-11 at Exh. 2), but she ended up leaving DeVry entirely in October 2009. (Offutt Decl., Doc. 84-5 at ¶ 3 & Exh. A). It is undisputed that DA Berry made the decision to terminate Castro after serving as her manager for over two years and having regular interactions with her concerning proration and other issues. As discussed previously, there is a paucity of evidence that Berry knew about the protected conduct and desired to terminate Castro because of it.

        **d.    Other Protected Conduct:** Castro asserts in passing that she "filed a series of EEOC charges while still employed at DeVry, which is also protected conduct." (Pls' Br., Doc. 73 at 14). While true, the entire focus of this lawsuit from the very beginning has been on whether Castro and her co-plaintiffs were terminated in retaliation for jointly complaining to HR about Giambone's derogatory comments in April 2007. *See* Compl., Doc. 1, ¶ 2 ("In or about April of 2007 plaintiffs complained to DeVry's Human Resources department about racist and discriminatory comments being made by their supervisor. Thereafter, defendant retaliated against the plaintiffs in various ways until, ultimately each of the plaintiffs were terminated."). When questioned at her deposition, Castro was clear that this was her claim. *See* Castro Dep., Doc. 49-10 at 367:6-9: (Q: "Your retaliation claim is that DeVry retaliated against you because you complained to Alana Hurt on April 16, '07, right? A: Yes.").

        Plaintiffs' decision to focus the allegations in the lawsuit and their discovery efforts on proving retaliation for the protected conduct in April 2007 appears to have been a tactical one. DeVry has moved for separate trials. (Doc. 58). Plaintiffs, on the other hand, want a joint trial at which they will seek to admit evidence of all the alleged

retaliatory acts that each Plaintiff experienced. To justify this, Plaintiffs emphasize the commonality in their allegations: "Each of the plaintiffs in this case engaged in the same protected conduct – the April 16th HR complaint. . . . All of the retaliatory acts occurred over the same 2 ½ year period and were committed by the same people. It is difficult to imagine a situation where evidence of retaliation against one person was more probative of the retaliation claim of another." (Pls' Br., Doc. 73 at 29).

Given the decision to allege and develop in discovery the theory that Plaintiffs' terminations were motivated by their joint complaint to HR about Giambone in April 2007, Castro cannot shift gears now. This is particularly so where she has not bothered to develop and present to the Court any evidence concerning the other protected conduct that she now mentions in passing, such as whether DA Berry was aware of the EEOC charges.[18]

## G. "Other Acts" Evidence Offered For All Plaintiffs

The preceding discussion leads to a final argument that is made on behalf of all Plaintiffs. They argue that "[a]lthough the evidence as to each of the plaintiffs has in part been discussed separately, all of the evidence should be weighed by the court, and applied to each plaintiff's claim in determining whether sufficient evidence has been presented to defeat summary judgment." (Pls' Br., Doc. 73 at 29). Such "retaliatory"

---

[18] The allegations made by Castro in certain of the EEOC charges arguably are inconsistent with the theory that Plaintiffs advance in their joint lawsuit focusing on the April 2007 protected conduct involving Giambone. *See* Castro's November 2008 EEOC charge alleging sex discrimination based on Castro's pregnancy and in retaliation for filing the January 2008 EEOC charge (Def's Appx., Doc. 49-36); Castro's EEOC intake questionnaire, complaining that her starts were not prorated because she filed a previous charge with the EEOC. (Castro Dep., Doc. 49-10 at 315:15-317:9); Castro's post-termination EEOC charge, alleging she was harassed and discharged after filing two EEOC charges. (Def's Appx., Doc. 84-15).

acts are described broadly as any "adverse employment actions" against any of the Plaintiffs between April 2007 and November 2009, such as "manipulation of performance reviews, falsification of documents, violation of practices regarding the issuance of warning letters and, ultimately, terminations based on false information." (*Id.* at 29). In evaluating each motion for summary judgment, this Court affirmatively considered *all* the evidence presented concerning *all* Plaintiffs in its totality. This evidence, however, fails to create a "convincing mosaic of circumstantial evidence" necessary to show a causal relationship between the protected conduct and decision to terminate the employment of any of the Plaintiffs. *See Volovsek v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 344 F.3d 680, 690 (7th Cir. 2003).

## CONCLUSION

For the reasons stated above, DeVry's motions for summary judgment as to the claims asserted by Florez, Brooks and Castro [Docs. 48, 51 & 54] are granted. Judgment is entered for DeVry on all claims.

ENTER:

Dated: April 22, 2013

SHEILA FINNEGAN
United States Magistrate Judge